CARRY COMPANIES OF ILLINOIS, INC., Petitioner, Cross–Respondent,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner,

and

Local 705, International Brotherhood of Teamsters, AFL–CIO, Intervenor, Cross–Petitioner.

Nos. 93–2509, 93–2657.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 8, 1994.

Decided July 29, 1994.

Gary S. Kaplan (argued), Fredric H. Fischer, Gerald L. Pauling, II, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Carry Companies of Illinois, Inc.

Charles P. Donnelly, Jr., N.L.R.B., Contempt Litigation Branch, Washington, DC, Elizabeth Kinney, N.L.R.B., Region 13, Chicago, IL, Aileen A. Armstrong, Vincent Falvo (argued), N.L.R.B., Appellate Court, Enforcement Litigation, Washington, DC, for N.L.R.B.

William A. Widmer, III, Martin P. Barr, Carmell, Charone, Widmer, Mathews & Moss, Chicago, IL, for Local Union 705, Intern. Brotherhood of Teamsters, AFL–CIO.

Before PELL, WOOD, Jr., and ESCHBACH, Circuit Judges.

ESCHBACH, Circuit Judge.

The National Labor Relations Board (NLRB or Board) found that Carry Companies of Illinois, Inc. (the Company) committed several unfair labor practices as defined by the National Labor Relations Act, 29 U.S.C. §§ 151–159 (the Act). The Company petitioned for review of the Board's Decision and Order and the Board filed a cross-application seeking enforcement of its Order. We have jurisdiction to hear this appeal under 29 U.S.C. §§ 160(e) and (f). For the reasons that follow, we grant the Company's petition for review in part, and the Board's application for enforcement in part.

## I. Background

Carry Companies of Illinois, Inc. engages in the transportation, distribution, warehousing, and packaging of food products. In addition to its main facility and headquarters in Bridgeview, Illinois, the Company maintains several other satellite facilities in the Midwest and on the East Coast. The warehousing portion of the operation, Hollander Distribution Services, is located at the main terminal. The trucking portion of the operation, Carry Transit, provides common and contract carrier services in the continental United States and Canada. Carry Transit's drivers are either "city" drivers who drive within a hundred mile radius of a Company facility or "road" drivers who drive longer distances and are paid by the mile.

In the fall of 1989, H. William "Bill" Rosenberg, a city driver, contacted the Local 705 International Brotherhood of Teamsters, AFL–CIO (the Union) and arranged for a meeting of interested employees in January 1990. Following the meeting, Rosenberg campaigned for the Union by soliciting and collecting union authorization cards from the Company's city drivers. Road driver Edward "Eddie" Peralta assisted in the campaign by soliciting the road drivers and collecting their signed authorization cards. Other employees also participated in the campaign. Dean Ridder distributed authorization cards to warehouse employees and driver Dean Jones held a union meeting at his home. On August 6, 1990, the Union filed a petition to represent the Company's mechanics and truck drivers. The Board conducted an election and a majority of both the mechanics and truck drivers rejected union representation.

At some point during or after the union campaign, the Company fired Ridder, Jones, Rosenberg, and Peralta. The Union filed unfair labor practice charges with the NLRB for all four men and the NLRB General Counsel issued a consolidated complaint on June 12, 1991. After eight days of testimony, an NLRB Administrative Law Judge (ALJ) found that the Company violated section 8(a)(1) of the Act by: surveilling employee union activities; coercively interrogating employees about union activities; threatening employees with discharge, loss of work, or the hiring of new employees to defeat the Union; promising to restore lost overtime to discourage union support; and promulgating an overly broad rule forbidding union solicitation on "company time." The ALJ further found that Company violated sections 8(a)(1) and (3) of the Act by discharging Ridder, Jones, Rosenberg, and Peralta.[1]

---

1. The ALJ also considered whether the Company discharged another employee, Raymond Krause, in violation of sections 8(a)(1) and (3). The ALJ found that the Company's termination of Krause was not unlawful and the Board upheld the ALJ's

Except in two respects, the Board's Decision and Order adopted the ALJ's findings and conclusions.[2] The Board found that the ALJ's conclusion that the Company violated sections 8(a)(1) and (3) of the Act by suspending Rosenberg and issuing warnings to him for lateness was not supported by any findings of fact. The Board also determined, contrary to the ALJ's conclusion, that the facts put forth at the hearing sufficiently supported a finding that the Company reduced Peralta's overtime and weekend assignments because of his union activity and thereby violated sections 8(a)(1) and (3) of the Act. The Company filed a petition to review the Board's order in this Court on June 23, 1993. In turn, the NLRB filed a cross-application for enforcement of its order.

## II. Standard of Review

■ Judicial review of an NLRB order, whether initiated by a petition for review or an application for enforcement, is governed by sections 10(e) and (f) of the Act. We must uphold the Board's decision if substantial evidence on the record as a whole supports its factual findings and if its conclusions have a reasonable basis in the law. *Chicago Tribune Co. v. NLRB*, 962 F.2d 712, 716 (7th Cir.1992) (quoting *NLRB v. George Koch Sons, Inc.*, 950 F.2d 1324, 1330 (7th Cir.1991)); 29 U.S.C. §§ 160(e) and (f). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support the Board's conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951). "While we may not dabble in fact-finding or displace reasonable determinations simply because we would have reached a different conclusion, a merely cursory review is inadequate, for we must take into account the entire record, 'including the evidence opposed to the Board's view from which conflicting inferences could be drawn.'" *Chicago Tribune*, 962 F.2d at 716 (quoting *George Koch Sons, Inc.*, 950 F.2d at 1330). However, an ALJ's credibility determinations are entitled to considerable deference and will be

overturned by a reviewing court only when extraordinary circumstances so require. *NLRB v. Advance Transp. Co.*, 979 F.2d 569, 573 (7th Cir.1992); *Missouri Portland Cement Co. v. NLRB*, 965 F.2d 217, 219 (7th Cir.1992).

## III. Analysis

The Company vigorously contests the Board's conclusion that it violated sections 8(a)(1) and (3) of the Act. It argues that it demonstrated that each employee's discharge occurred solely because of the employee's own misconduct. The Company also contends that neither substantial evidence nor applicable legal principles established that any of its conduct amounted to a section 8(a)(1) violation. We address the Company's contentions in turn.

### A. The Discharges of Ridder, Jones, Rosenberg, and Peralta

■ An employer commits an unfair labor practice if it interferes with, restrains, or coerces employees in the exercise of their rights guaranteed in section 7 of the Act, 29 U.S.C. § 157, "by discriminating in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor union organization." 29 U.S.C. §§ 158(a)(1) and (3). Union activism is a protected right, and an employer cannot discharge an employee for exercising rights guaranteed by the Act. However, union activism is not an impenetrable shield against discharge, and the Act "does not give union adherents job tenure." *Chicago Tribune*, 962 F.2d at 716 (quoting *NLRB v. Loy Foods Stores, Inc.*, 697 F.2d 798, 801 (7th Cir.1983)). A company is free to discharge its employees "for good, bad, or no reasons, so long as its purpose is not to interfere with union activity." *Loy Foods*, 697 F.2d at 801.

■ Whether the Company violated section 8(a)(3) of the Act by discharging Ridder, Jones, Rosenberg, and Peralta is governed by *Wright Line, a Div. of Wright Line, Inc.*, 251 N.L.R.B. 1083, 1980 WL 12312 (1980),

---

dismissal of Krause's complaint. Krause did not seek review of the Board's decision.

**2.** *Carry Companies of Illinois,* 311 N.L.R.B. No. 107 (1993).

*enf'd,* 662 F.2d 899 (1st Cir.1981), *cert. denied,* 455 U.S. 989, 102 S.Ct. 1612, 71 L.Ed.2d 848 (1982). Under *Wright Line,* the General Counsel carries the burden of showing that the Company's actions were motivated by a desire to impede protected activity. *NLRB v. Transportation Mgt. Corp.,* 462 U.S. 393, 399, 103 S.Ct. 2469, 2473, 76 L.Ed.2d 667 (1983); *Missouri Portland Cement,* 965 F.2d at 219. To this end, the General Counsel must establish by a preponderance of evidence that: (1) the employee engaged in union or other protected activities; (2) the employer knew of the employee's involvement in protected activities; (3) the employer harbored animus towards those activities; and (4) there was a causal connection between the employer's animus and its discharge decision. *NLRB v. Advance Transp. Co.,* 965 F.2d 186, 191 (7th Cir.1992). If the General Counsel succeeds, the burden shifts to the employer to demonstrate by a preponderance of evidence that it based its discharge decision on unprotected conduct and that it would have fired the employee anyway. *Transportation Mgt.,* 462 U.S. at 400, 103 S.Ct. at 2473–74; *Advance Transp.,* 965 F.2d at 190.

### 1. Dean Ridder

The Company hired Ridder in July 1985. Ridder first worked as a truck driver and then as a warehouseman until he was discharged on July 20, 1990 for urinating in the yard outside of the food warehouse. The ALJ concluded that the Company discharged Ridder because of his support for the union campaign and that the Company's reason for Ridder's discharge was pretextual. The ALJ found that "the conduct for which Ridder was fired had been a common practice among the Company's employees, including dispatchers and supervisors." He further found that "the only time the Company rebuked someone for such conduct involved an employee of another company as he used the Company's property."

The Company contends that the ALJ's finding of an unlawful discharge cannot be sustained because the General Counsel failed to demonstrate that the Company knew of Ridder's protected activities or that anti-un-ion animus motivated its decision to terminate Ridder. Additionally, the Company argues that even if the General Counsel met his *Wright Line* burden of proof, Ridder's discharge still did not violate the Act because the Company amply demonstrated that it would have discharged Ridder for his misconduct and poor work record regardless of any protected activity.

After careful review of the record, we conclude that the ALJ's finding of unlawful discharge cannot be sustained because of the lack of substantial evidence demonstrating the Company's knowledge of Ridder's union activities. The ALJ relied on two incidents from which he concluded that the Company knew of Ridder's support for the Union. On the first occasion, David Amthor, a Hollander supervisor, had just finished verbally reprimanding Ridder for loading too many pallets on a truck. After Ridder assured him that he would not make the same mistake again, Amthor stated, "the Union was a crazy idea." On the second occasion, Ridder was conversing with a fellow warehouse employee, Art Belstra, in the presence of a supervisor, Kevin Oezer. Ridder told Belstra that "the drivers of Carry Transit had enough authorization cards signed to have an election for the Union, and that the warehousemen should decide what they were going to do." Belstra replied that he did not think the Union was the answer to their problems, although management did ask a lot of them. Supervisor Oezer also stated that he did not think the Union was the answer to their problems.

The ALJ concluded that Amthor's and Oezer's comments indicated "the Company's anti-union animus and knowledge of Ridder's union support." We do not agree. Amthor's and Oezer's comments about the Union were brief expressions of their personal opinions. Under section 8(c) of the Act, employers and supervisors may openly express anti-union sentiment without committing an unfair labor practice provided their expressions contain no threat of reprisal or force or promise of a benefit. *See* 29 U.S.C. § 158(c). Section 8(c) also states that noncoercive expressions of opinion are not to be used as evidence of an unfair labor practice under any provisions of the Act. *Id.* In this

case, the ALJ made no finding that either supervisor's comment was coercive or violative of the Act. Additionally, Ridder's comment to Belstra did not indicate Ridder's view of or participation in the union campaign, and any conclusion to the contrary, is sheer speculation. For these reasons, we cannot accept the ALJ's reliance on two brief comments by Ridder's supervisors as substantial evidence of the Company's knowledge of Ridder's union activities. *See Advance Transp.*, 965 F.2d at 191 (requiring knowledge of the employee's union activity as element of the *prima facie* case under *Wright Line* ). Given our conclusion, we need not address the Company's other contentions regarding Ridder's discharge.

## 2. Dean Jones

Employed as a road driver since December 1986, Jones was discharged on October 2, 1990, for carrying an unauthorized passenger in his truck. The incident leading up to Jones' discharge occurred on Sunday evening, September 30. Jones went to the Company terminal in Lafayette, Indiana to get his tractor ready for a run the following day. As he was about to leave the terminal, an attendant asked Jones whether he was leaving on a trip. Jones replied no, stating that he and his son Brock had come to take the truck home to clean it. Jones then left the terminal. Two days later, Mike Tallaksen, Vice President for Safety and Personnel for Carry Transit, questioned Jones about having a passenger in his truck. Jones admitted that he had allowed his son to ride in the truck and stated that for almost four years, his son had accompanied him when he took his truck home for cleaning. Tallaksen informed him that carrying a passenger without proper insurance and authorization violated Company policy and federal regulations and then fired him.

The ALJ determined that the Company's stated reason for firing Jones was a pretext. The ALJ found that the Company had been

aware of Jones' prior transportation of his son in his truck while off-duty over the past four years and had taken no action against him. He also found that Jones' practice may not even be contrary to the Company's Rider Policy or federal regulations because Jones was off-duty when his son rode in the truck. In light of what he termed to be the "sudden application" of the Company's policy, the ALJ concluded that "[t]he timing of Jones' discharge, approximately 2 weeks after a union meeting at his home, the Company's knowledge of his union activity, and Tamminga's adverse comments about Jones, lead to the obvious inference, that the [Company] used the rider incident in a disingenuous attempt to rid itself of a union supporter."

As with Ridder, the Company argues that the General Counsel failed to make its *prima facie* case with respect to Jones' discharge. The only evidence of the Company's knowledge of and animus towards Jones' protected activities came from the testimony of another Lafayette driver, Willus Drescher, regarding a conversation he had with Randal Tamminga, Vice President of Operations for Carry Transit.[3] The Company maintains that Drescher's testimony was sufficiently inconsistent, self-contradictory, and incredible that the ALJ should not have relied upon it, particularly in the face of Tamminga's sworn denials.

The law is clear—where there are two materially conflicting versions of the same incident, an ALJ's credibility determinations are entitled to deference. *Advance Transp.*, 979 F.2d at 573; *NLRB v. Augusta Bakery Corp.*, 957 F.2d 1467, 1477 (7th Cir. 1992). We will not overturn such determinations absent extraordinary circumstances, which include a clear showing of bias by the ALJ, an utter disregard for uncontroverted sworn testimony or the acceptance of testimony which on its face is incredible. *Advance Transp.*, 979 F.2d at 573 (citations omitted). Such circumstances are not pres-

**3.** Drescher testified that approximately one week after the union meeting at Jones' house, Tamminga asked him "if [he] knew of a Teamsters meeting in Lafayette." Drescher said no and sarcastically remarked, "Why do we even need the Teamsters here because the dispatch is so fair to

us and everything is so great?" Tamminga replied that he was very unhappy with one of the Lafayette drivers, namely Dean Jones, because "he is not working for the Company, he is not Carry material."

ent in this case. Drescher's testimony was not so incredible or inconsistent that the ALJ could not reasonably have relied upon it. The ALJ specifically found Drescher to be forthright and his story plausible, noting that Drescher had nothing to gain by testifying against his employer's interests. Because the Company advances no other argument relating to its knowledge of Jones' union activity, we agree with the Board that the General Counsel established a *prima facie* case of unlawful discharge.[4]

■ Alternatively, the Company contends that it demonstrated by a preponderance of the evidence that even in the absence of Jones' union activity, the Company would have discharged Jones for violating its Rider Program. It contends that the ALJ's conclusion that the Company had previously condoned Jones' carrying of a passenger without express permission ignored the fact that the Rider Program was a new program. The Company also maintains that the ALJ improperly ignored evidence of the Company's consistent application of the program's strictures to its employees. We agree with the Company that the ALJ incorrectly assessed the Company's evidence and conclude that the Company did, in fact, lawfully discharge Jones.

Put into effect in July 1990, the dictates of the Company's Rider Policy are clear. It states that "any driver who is caught with a rider and has failed to purchase insurance and/or failed to obtain [a] letter of authoriza-

tion *will* be terminated" (emphasis added). The Company instituted the program at the urging of Tallaksen as a way to protect the Company from potential liability yet still allow drivers to occasionally take passengers in their trucks.[5] At the hearing, Jones conceded that he knew the Company had a new policy regarding the carrying of passengers in Company trucks but stated that he had not seen the policy in writing and had been under the impression that it applied only when he was driving on company time.[6] He also admitted that while he saw drivers with riders in their trucks prior to the policy, he never saw any driver with a rider after the policy went into effect.

■ Despite this evidence, the ALJ concluded that the Company did not discharge Jones because of his violation of the Rider Policy. We do not agree. To be sure, where an employer establishes a regular pattern of overlooking certain violations of company policy, the employer may not later rely on such violations to satisfy its burden under *Wright Line. See, e.g., NLRB v. Del Rey Tortilleria, Inc.,* 787 F.2d 1118, 1124 (7th Cir.1986); *NLRB v. Bliss & Laughlin Steel Co.,* 754 F.2d 229, 236 (7th Cir.1985). However, this principle does not apply here because there is no evidence that the Company established a pattern of overlooking violations of its Rider Program. To the contrary, the Company terminated another driver for

---

4. The Company also argued that there is no evidence that union animus motivated its decision to discharge Jones. The Company argues that in late July 1990, it could have discharged Jones for his heated exchange with Tamminga over work matters but declined to do so. The Company also points out that it provided Jones with a new trucking unit within a few weeks after that incident. The Company maintains that these "acts of forbearance and generosity" towards Jones undermine any inference of animus. *See, e.g., NLRB v. Newman–Green, Inc.,* 401 F.2d 1, 4 (7th Cir.1968) (employer's restraint at first opportunity to discharge employee undermines inference of union animus); *General Motors Corp.,* 243 N.L.R.B. 614, 618, 1979 WL 9306 (1979). The fallacy of the Company's argument lies in the timing of its "acts of forbearance and generosity." Both acts occurred well before the September 15 meeting. Since it is quite likely that the Company did not know of Jones' support for the Union until that meeting, the ALJ correct-

ly declined to draw any inferences from the Company's earlier acts.

5. As Tallaksen testified, federal regulations prohibit drivers from taking passengers without the authorization of the carrier. Since the Company's primary insurance covered only Company employees, Tallaksen was concerned that the Company would be liable for any passengers carried in Company trucks. Therefore, Tallaksen implemented this supplemental insurance program thereby allowing drivers to purchase insurance to cover passengers taken along with them in their trucks.

6. The Rider Program was added to the Carry Transit Employee Manual. Company officials assert that the notice of the policy and its details were placed in every driver's pay envelope and posted on news bulletin boards.

the same offense a month and a half after Jones' discharge.[7] The Rider Policy constituted a break from the Company's past practices and the ALJ's heavy reliance on the Company's awareness of Jones' previous actions was unwarranted.[8] For these reasons, we conclude that the Company's discharge of Jones did not constitute an unfair labor practice.

### 3. H. William "Bill" Rosenberg

 With regard to both Rosenberg and Peralta, the General Counsel established its *prima facie* case of unlawful discrimination. The Company opposed union representation and knew of both men's union activities. In addition to the various instances of Company interrogations and threats relating to the union campaign, Valerie Albright, Tallaksen's assistant from August to December 1990, testified that the Company desired a "legitimate reason" to come along so that Rosenberg and Peralta could be terminated.[9] Therefore, the issue before the Board was whether the Company demonstrated by a preponderance of the evidence that it would have discharged both Rosenberg and Peralta in the absence of their protected conduct.

 Employed as a driver since April 1983, Rosenberg was discharged on March 1, 1991, for being late three times in a six-month period. Rosenberg was late for work on July 27, October 30, and December 28, 1990. After the last incident, Tallaksen suspended him for three days, warning that his next incident of lateness would result in discharge.

The next incident occurred on February 28, 1991. On that day, Rosenberg had a 3:00 a.m. start time. When dispatcher Wes Van Bruggen noticed at 3:30 a.m. that Rosenberg still had not arrived at the terminal, he telephoned Rosenberg's home. A female answered the telephone and told Van Bruggen that Rosenberg was still in bed asleep. Van Bruggen asked her to wake Rosenberg because he was already a half hour late. The female said she would do so and hung up. Approximately five minutes later, Rosenberg called dispatch and informed them that he was sick and unable to report for work. At 4:00 p.m., Rosenberg called again to inform the dispatch office that he could not work the following day. He also spoke briefly with Tallaksen.

The next morning, Tallaksen telephoned Rosenberg and asked him why he had not come in for his 3:00 a.m. start the previous morning. Rosenberg told him he had been on his way to work when he suddenly became ill with diarrhea and had to go back home to clean himself up. Rosenberg then asked Tallaksen if he needed a doctor's excuse before returning to work. Tallaksen said that a doctor's excuse would not be necessary because "if you pay the money the doctor will give you a release." Tallaksen then told Rosenberg he was terminated for being late three times in a six-month period. At some point, Rosenberg told Tallaksen that when dispatch called his house on the morning of February 28, his sixteen-year old daughter had answered the phone, checked her parents' bedroom, and had mistakenly thought that he was still in bed when, in fact, it was actually Rosenberg's eleven-year old daugh-

7. The Company discharged another employee on November 19, 1990 for transporting an unauthorized passenger while making an official delivery. The ALJ found that this discharge was not comparable to Jones' because Jones had taken his son in his truck while he was off-duty. The ALJ's distinction is unsupportable. Whether a driver is "on-duty" or "off-duty" when he transports an unauthorized passenger is irrelevant to the Company's insurance and liability concerns.

8. We note also that the evidence demonstrating the Company's awareness and condonation of Jones' previous actions is exceedingly slim. The only evidence offered in support of this claim was Jones' testimony that Company owner Tom

Wieranga once saw Jones with his son in his truck *two years prior* to the adoption of the Rider Policy.

9. Albright testified that before the union election Tallaksen asked her if she wanted to know who was really pushing for the Union. She said yes, and he told her it was Bill Rosenberg and Eddie Peralta. Albright also reported that Tallaksen said that after the union voting, "they were going to definitely find a way to terminate Bill Rosenberg and Eddie Peralta, but that it would have to be something legitimate" and that Rosenberg and Peralta "were definitely out." The ALJ found Albright's testimony credible.

ter in bed with her mother.[10] Tallaksen declined to change his decision based on Rosenberg's story and stood by his decision to terminate Rosenberg for lateness.

The ALJ found that the "record fully supports a finding that the [Company] waited for just such an incident as a pretext to rid itself of the principal union activist" and gave two reasons to support his conclusion. First, the ALJ found that while Rosenberg's claim of illness on the morning of February 28 raised "valid grounds for suspicion," Tallaksen failed to follow his usual practice of requiring employees to produce a doctor's release when he was skeptical about their claim of illness. Instead, Tallaksen presumed that Rosenberg would simply obtain a physician's release by paying the physician's fee. The ALJ also found that the Company deviated from its regular practices by treating Rosenberg's tardiness more severely than that of other employees.

The Company vigorously argues that both of the ALJ's conclusions are wrong and not supported by substantial evidence. After careful consideration and examination of the record, we find sufficient evidence in the record to support the ALJ's conclusion that the Company's discharge of Rosenberg was motivated by Rosenberg's protected activities. Several pieces of evidence support the ALJ's conclusion that Tallaksen treated Rosenberg's claim of illness differently from other similar claims. Tallaksen admitted that he was suspicious of Rosenberg's claim of illness from the start and yet he never accused Rosenberg of falsifying his reason for failing to appear for his run. Given that Tallaksen knew from the dispatcher's report

that a female at the Rosenberg house had told dispatch that Rosenberg was still asleep at 3:30, why Tallaksen did not confront Rosenberg with this choice bit of information before terminating him is puzzling. The ALJ could reasonably have inferred that because of hostility toward Rosenberg's union involvement, Tallaksen did not confront Rosenberg because he did not want to give Rosenberg any opportunity to explain himself out of a termination. Tallaksen's refusal to consider a doctor's release supporting Rosenberg's claim of illness further bolsters the ALJ's conclusion that Tallaksen treated Rosenberg differently than other cases.

Additionally, the ALJ's second reason for finding a section 8(a)(3) violation—that the Company treated Rosenberg's incidents of lateness more severely than that of its other employees—is supported by substantial evidence. As the ALJ found, the Company's employee manual did not reflect the Company's policy of requiring discharge after three instances of lateness within a rolling six-month period.[11] Tallaksen testified that he implemented the "three tardies"[12] policy when he began working for the Company in May 1990 but that he never informed the drivers of the new policy. Although Rosenberg was aware of the policy, several other drivers were not. Tallaksen also testified that he did not always hold drivers to the strict letter of the policy.

Despite this evidence of discretion in the application of the three-tardies policy, the Company argues that it demonstrated its consistent application of the policy to all drivers. Like the ALJ, we do not find the Company's examples to be convincing. One

**10.** The ALJ did not address when Rosenberg first informed Tallaksen of his daughter's mistaken report to dispatch. Tallaksen testified that Rosenberg did not mention his daughter's error until Rosenberg came to the terminal to collect his belongings, several days after his discharge. In contrast, Rosenberg testified that he informed Tallaksen of the mistake when he spoke with him on the afternoon of February 28.

**11.** The Company's employee manual states that "absences and late arrivals may result in corrective action up to and including termination" and describes its corrective action to include verbal and written warnings, suspension, and discharge.

**12.** According to Tallaksen, for the first violation, an employee receives a written warning. If he commits a second attendance/tardiness violation within six months of the first incident, he receives a written notice and a disciplinary suspension. If the employee commits yet a third violation within six months of the first, generally he is terminated. Under the policy, attendance violations cease to count for disciplinary purposes after six months and thus the policy counts only the number of violations in a "rolling six-month period."

of the employees discharged under the policy, John Rose, was a probationary employee,[13] and another, William Blake, committed several other offenses in addition to tardiness. Gerald Rydman, the third employee who the Company claimed to have discharged under the policy, testified that he quit voluntarily. Additionally, Rydman's disciplinary write-ups do not indicate that three instances of tardiness in a rolling six-month period were the cause of his discharge, assuming, of course, that the Company did in fact terminate Rydman.[14] Finally, the Company's disciplining of driver Scott DeBoer actually demonstrates the Company's disparate application of its tardiness policy. Although the timing of DeBoer's three chastisements is consistent with a rolling six-month policy,[15] the Company conveniently ignores the testimony of Valerie Albright. Albright specifically recalled five instances when DeBoer was late during the five months of her employment as Tallaksen's assistant. In light of her testimony, the ALJ reasonably found that the Company failed to discipline DeBoer consistently for his lateness; a sharp contrast to the Company's treatment of Rosenberg.

### 4. Edward "Eddie" Peralta

Edward Peralta began his employment with the Company in December 1989 as a road driver. He soon became one of the Union's principal advocates, campaigning among the Company's road drivers and attending the Union's petition hearing in late August 1990 as a witness for the employees. Beginning in late August, Peralta began to lose much of his overtime and weekend work. On December 3, 1990, the Company suspended Peralta for being late. Finally, on April 30, 1991, the Company discharged Peralta for unauthorized use of Company equipment and for leaving a loaded food-grade trailer unattended at a truck stop.

The General Counsel established its *prima facie* case that the Company reduced Peralta's overtime and weekend work, disciplined him, and ultimately discharged him because of his union activities. Therefore, the question before us is whether the Company carried its *Wright Line* burden of proof by demonstrating that in each instance, in the absence of Peralta's protected activity, it would have taken the same actions against him.

### a. Suspension and Discharge

■ On December 3, 1990, Peralta left the terminal on time for a scheduled 4:00 a.m. run. Shortly after leaving the terminal, Peralta noticed he had forgotten to turn in some paperwork for the prior week, so he returned to the terminal. At the dispatch office, dispatcher Van Bruggen told him he was late. Peralta expressed his disagreement, handed in his papers, and left for his scheduled pick-up. He arrived on time for the scheduled pick-up. Nevertheless, on December 5, Tallaksen suspended Peralta for three days citing two prior incidents of tardiness.

The ALJ found that the Company's discipline of Peralta was discriminatory. According to the ALJ's findings, under Company policy a road driver is not considered late if he is on time for his delivery or pick-up at the destination. The ALJ concluded that although Peralta was "arguably late in his starting time," he should not have been disciplined because his pick-up was timely. We affirm the ALJ's conclusion in light of the

---

**13.** The Company argues that no evidence in the record demonstrates that Rose was a probationary employee. We disagree. Tallaksen testified that Rose was possibly a probationary employee and the Company offered no proof that he was not. Given that a Company official raised the spectre of Rose's probationary status, we believe it is incumbent upon the Company to prove otherwise.

**14.** At oral argument, the Company placed great importance on the fact that the ALJ did not discuss Rydman. In light of the facts distinguishing Rydman's separation from the Compa-

ny from other terminated employees, we do not agree that the ALJ's failure to analyze Rydman's alleged discharge affects the validity of his fact-findings.

**15.** The Company's records demonstrate that DeBoer was late July 18, 1990 and again on September 27, 1990 at which time he received a three day suspension. DeBoer received a second three-day suspension for being late on February 1, 1991, his second offense in a rolling six-month period.

Company's failure to dispute the ALJ's finding that the Company had a policy of not disciplining road drivers who start late but make the scheduled pick-up or delivery on time. In light of such a policy, the ALJ reasonably concluded that the Company disciplined Peralta only because of its hostility towards his union involvement.

▮ The facts relating to Peralta's discharge are as follows. On April 29, 1991, dispatcher David Hoekstra instructed Peralta that he had a delivery to Battle Creek, Michigan, at 7:00 a.m. the next morning. Peralta reminded Hoekstra that his home in Lake Station, Indiana, was en route to Battle Creek and asked Hoekstra whether he could take his truck home and leave from his house the following morning. Hoekstra replied, "Eddie, I don't care what you do, just get out of here." Peralta assumed he had permission and noted on his dispatch sheet and logbook: "Lake Station, as per dispatch okayed Dave Hoekstra" and punched it in the time clock.

Peralta drove to Lake Station and parked and secured the truck's trailer at the Petro Truck Stop near his home. He then drove the truck tractor to his house and returned to the truck stop around 2:00 a.m. Peralta timely made the delivery to Battle Creek and returned to the Bridgeview terminal. When he arrived, Tallaksen demanded to see Peralta's logbook and expressed surprise when he found that Peralta had received permission from Hoekstra to take his truck home. When Tallaksen confronted Hoekstra, he denied giving Peralta permission to park his trailer near his home, claiming only to have given Peralta permission to sleep with the load en route. After a few minutes more, Tallaksen told Peralta that he was terminated for unauthorized use of company equipment and for leaving his loaded trailer at a truck stop.

The ALJ concluded that the Company's discharge of Peralta was discriminatory. We

agree. As discussed above, once the General Counsel makes a *prima facie* showing of an unlawful discharge, the burden of proof shifts to the employer to demonstrate that it based its discharge decision on unprotected conduct and that it would have fired the employee anyway. · *Transportation Mgt.*, 462 U.S. at 400, 103 S.Ct. at 2473–74. In this case, the Company failed to demonstrate that it would have discharged Peralta for his misconduct in the absence of his protected activity.

As the Company all but concedes, Hoekstra did give Peralta permission to take his truck to his home in Lake Station, Indiana.[16] Therefore, the question is whether Peralta's act of leaving the trailer at the Petro Truck Stop constituted the type of misconduct which the Company would normally treat as a dischargeable offense. The Company contends that it had an unambiguous policy against allowing drivers to drop their trailers and take their tractors home separately. It cites to a November 1990 written policy stating that no driver may park a unit at any location other than a Carry terminal unless he or she has a safe and legal place to park the whole unit (i.e., tractor and trailer) and company authorization. However, the Company's own evidence demonstrates that its actual practices were at odds with its written policy. Vice President Tamminga's list cataloguing the various non-terminal locations he approved of clearly shows that some drivers had permission to drop their trailers at locations away from their homes. Additionally, the Company's written policy does not call for termination in the event of a violation and the Company offers no evidence that it either disciplined or discharged any other employees for dropping a trailer after receiving permission to take their truck unit home. In light of the Company's failure to meet its burden of proof under *Wright Line*, we uphold the ALJ's conclusion that the Company's discharge of Peralta violated sections 8(a)(1) and (3).

---

16. The Company argues that Peralta should not have sought permission from Hoekstra in the first instance because Tallaksen had previously directed Peralta never to take his truck home. The Company's reliance on Tallaksen's previous direction is unusual, given that Tallaksen told

Peralta not to take his unit home because the Company was "watching him" and that they "wanted his ass." Given the unlawful motivation for Tallaksen's direction, we decline to draw any inferences from it.

### b. Reduction of overtime and weekend work

■ From the start of his employment with the Company, Peralta frequently worked overtime assignments on Saturdays and Sundays. In late August 1990, approximately two days after Peralta served as an observer at a Board hearing, two dispatchers informed Peralta that the Company's management had instructed them not to give Peralta weekend assignments. One added that Peralta "no longer existed" in the eyes of Company owner, Tom Wieranga and Company president, Howard Hoving. When Peralta approached Hoving about his overtime assignments and the remark that he did not exist anymore, Hoving responded that he considered the issue closed. Thereafter, Peralta's weekend and overtime hours decreased dramatically.

The Board found that the Company violated sections 8(a)(1) and (3) by reducing Peralta's overtime and weekend assignments. It concluded that the Company did not carry its *Wright Line* burden because the Company failed to establish either that it effectuated the reduction in Peralta's overtime and weekend work prior to Peralta's union activity or that Peralta's reductions were part of a general plan to reduce drivers' hours in an equal and nondisparate fashion. We agree with the Board's analysis of the Company's offer of proof and affirm its finding that the Company adversely altered the terms and conditions of Peralta's employment as punishment for his union activities.

### B. *Violations of Section 8(a)(1) of the Act*

■ Section 7 of the Act guarantees employees "the right to self-organization, to form, join, or assist labor organizations, ... and to engage in other concerted protected activities for the purpose of collective bargaining or other mutual aid and protection...." 29 U.S.C. § 157. Section 8(a)(1) of the Act implements this guarantee by making it an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of their rights" as guaranteed by section 7 of the Act. The test for a violation of § 8(a)(1) is not whether an employer intended to interfere with its employees' union activities, or whether any interference or coercion actually oc-

curred. Rather, it is whether the employer's actions "reasonably tended to interfere with or coerce employees in the exercise of their protected rights." *Weather Shield Mfg., Inc., Millwork Div. v. NLRB,* 890 F.2d 52, 56 (7th Cir.1989); *Northern Wire Corp. v. NLRB,* 887 F.2d 1313, 1317 (7th Cir.1989).

■ The ALJ determined that the Company violated section 8(a)(1) on a number of occasions by: (1) coercively interrogating employees about union activities and their involvement; (2) threatening adverse consequences because of employees' union activities; (3) promising benefits to Peralta if he refrained from union activities; (4) surveilling union leafletting; and (5) curtailing union solicitation in an overly broad manner. After careful review, we conclude that none of the Company's challenges are meritorious. Each of the ALJ's findings of section 8(a)(1) violations is supported by substantial evidence and in full accord with governing legal principles.

### IV. Conclusion

For all of the reasons given above, we GRANT the Company's petition for review in regard to the discharges of Dean Ridder and Dean Jones and VACATE the Board's reinstatement order as to them. In all other respects, we GRANT the NLRB's cross-application for enforcement of its Decision and Order.