In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-2488 & 99-2778

Jet Star, Inc.,

Petitioner/Cross-Respondent,

v.

National Labor Relations Board,

Respondent/Cross-Petitioner.

Petition for Review and Cross-Application for Enforcement
of an Order of the National Labor Relations Board.
No. 13-CA-35087--Robert A. Giannasi, Administrative Law
Judge.

Argued January 10, 2000--Decided April 4, 2000

Before Flaum, Manion, and Evans, Circuit Judges.

Flaum, Circuit Judge.  Jet Star, Inc. petitions
for review of the National Labor Relations
Board's ("NLRB" or "Board") decision affirming an
administrative law judge's ("ALJ") finding that
the Company violated Sections 8(a)(1) and 8(a)(3)
of the National Labor Relations Act ("NLRA" or
"Act"), 29 U.S.C. sec. 151 et seq., by
discharging employee John Krueger in retaliation
for his union activities. The Board ordered Jet
Star to make Krueger whole for the discrimination
he suffered, including reinstatement, back pay,
the removal of any reference to the unlawful
discharge from his employment file, and the
posting of an appropriate notice. The Board
cross-petitions this Court for enforcement of
that order and, for the reasons stated herein, we
enter final judgment enforcing the Board's
decision and order in full.

I.  Facts

    Jet Star is a corporation primarily engaged in
the business of delivering jet fuel to airports.
The Company employs 180 employees at seventeen
terminals nationwide. It has forty employees and
seventeen trucks at its facility in Hammond,
Indiana.

    John Krueger, the Jet Star employee who is the
subject of the Board's unfair labor practice

charge in this case, was a driver at the Company's Hammond facility. He began working for Jet Star in July 1995, and received Company safety awards in both 1995 and 1996. The Company also gave Krueger a quarterly safety bonus, as well as a gift certificate in appreciation for his help in handling damaged trucks. Prior to coming to work at Jet Star, Krueger had accumulated approximately ten years experience driving trucks and approximately twenty years experience as an automobile mechanic.

In March 1996, Krueger and another driver visited the offices of Teamsters Local 142 and told officials of that union that the drivers at Jet Star were interested in improving their wages and working conditions. Soon after, Krueger began to speak with other drivers about improving their benefits. Krueger also attended union meetings and distributed union buttons and authorization cards. Local 142 eventually filed a petition for certification as the employees' collective-bargaining representative, and the Regional Director of the NLRB scheduled a representation election for June 1996.

During the election campaign, the Company instituted mandatory meetings with its drivers at which its management argued against union representation. Krueger defended the union at these meetings, and insisted that the employees deserved higher wages. When the union election was conducted, Krueger served as the union observer. Jet Star employees voted against union representation nineteen to fourteen.

In 1996 and early 1997, at about the same time as the union campaign, Jet Star began to experience excessive clutch and transmission failures in trucks at its Hammond facility. As a result of these problems, the Company was forced to make two costly transmission replacements in truck #296, as well as two transmission replacements and a clutch replacement in truck #298. Jet Star believed these equipment failures to be a direct result of employee abuse. The Hammond Terminal Lead Mechanic, Bill Atkins, informed Jet Star's Chief Executive Officer, Darryl Guiducci, that it was Krueger who was abusing the trucks.

In response to its equipment problems, Jet Star scheduled Safety Performance Observations ("SPOs") for nine drivers at the Hammond facility, including Krueger. During the SPOs, Guiducci, who oversees maintenance at the Company, rode with each driver and observed how he operated the truck. When he rode with Krueger, Guiducci noticed that Krueger was starting the truck from a stopped position in fourth or fifth

gear and was slipping the clutch badly. When a truck is operated in this manner, excessive heat is generated and the clutch and transmission can burn out, causing serious damage and necessitating extensive repairs.

At the conclusion of his SPO with Krueger, Guiducci informed Krueger that he would have to cease starting the truck in fourth or fifth gear because it caused the clutch to slip and consequently burned out the clutch and the transmission. Krueger acknowledged that he was starting the truck in this manner, but stated that he did not know it would damage the truck. Guiducci then demonstrated the proper way to start the truck, and told Krueger to watch an instructional video on the proper use of the clutch. Krueger was not formally disciplined at this time.

In January 1997, the Company informed the drivers that they would be hauling gas fuel, and Krueger inquired as to whether they were to receive a higher wage for carrying a more dangerous fuel. The Company denied this request for a pay raise. At about this time, several drivers approached Krueger about starting another union campaign. Krueger told them that they would have to wait a year before they could hold another election, but he urged them to go to the union hall and "to stay together."

After other drivers began to express interest in a renewed union campaign, Krueger contacted officials at Teamsters Local 705. He explained to a representative at Local 705 that several of the drivers had expressed concern about the leadership of Local 142, and asked the representative how Local 705 would go about addressing the drivers' concerns. In total, Krueger had approximately six or seven conversations with union officials at Local 705. In February 1997, at the request of union supporter Wesley Gillian, Jet Star dispatcher Amy Gregory faxed a copy of Local 705's bylaws to driver John Ramos. The faxed document was received at the motel at which Ramos was staying, but he never received the document. Eventually, Ed Bell, Jet Star's Director of Operations, obtained a copy of the bylaws. Gregory was then asked if she knew anything about the bylaws by the Hammond facility's Terminal Manager, Mark Smith. When Gregory responded that she did not, Smith stated: "[W]e need[ ] to start pushing the issue of writing drivers up. And three in particular because they are getting the [u]nion vote." According to Gregory, Smith named Krueger as one of the drivers he was particularly concerned about. Gregory also testified that she overheard a conversation between Smith and Bell

during which Smith said he needed some reason to fire Krueger.

On March 10, 1997, Krueger left the Hammond facility to deliver a load of jet fuel to Midway Airport in Chicago, Illinois. While Krueger was exiting the terminal parking lot, Fleet Manager Robert Mulligan and Terminal Manager Smith observed him starting the truck in too high a gear. Krueger completed his delivery to Midway and, when he informed the Company he had extra fuel remaining, he was instructed to make a second delivery that he successfully completed.

When Krueger reported to work on March 11, 1997, he was told that Smith wanted to see him. When Krueger reported to Smith's office, he was given a discharge form signed by Smith and witnessed by Mulligan. The form stated that Krueger was being discharged for abuse of equipment in violation of Company Rule I(a)(4)./1 Smith told Krueger that the discharge was not his idea, and that the order came from Company headquarters. Gregory testified that after Kreuger left she overheard Smith say, "[W]e finally got him."

On April 17, 1997, Krueger filed an unfair labor practice charge against Jet Star with the Chicago regional office of the NLRB. In his charge, Krueger alleged that Jet Star violated Sections 8(a)(1) and 8(a)(3) of the NLRA when it terminated his employment based upon his union activities. The Chicago regional office issued a complaint on the charge and a hearing was conducted before ALJ Robert Giannasi on June 29 and 30, 1998.

On September 16, 1998, the ALJ ruled that Jet Star discriminatorily discharged Krueger in violation of Sections 8(a)(1) and 8(a)(3) of the NLRA. The case was then transferred to the NLRB. On March 27, 1999, the NLRB issued its decision and order adopting the ALJ's rulings, findings, and conclusions. Jet Star now petitions for review of the NLRB's March 27 decision and order, and the NLRB cross-petitions for enforcement of that order.

II. Analysis

The Board affirmed the decision of the ALJ in which the ALJ found that in discharging Krueger Jet Star violated Sections 8(a)(1) and 8(a)(3) of the NLRA. Section 7 of the Act guarantees employees "the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of

collective bargaining or other mutual aid or protection . . . ." 29 U.S.C. sec. 157. Section 8(a)(1) protects these rights by making it an unfair labor practice for employers "to interfere with, restrain, or coerce employees in the exercise of [their Section 7 rights] . . . ." 29 U.S.C. sec. 158(a)(1). Section 8(a)(3) also helps to effectuate employees' ability to unionize by prohibiting employers from "discriminati[ng] in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. sec. 158(a)(3).

It is well-established that Jet Star violated Sections 8(a)(1) and 8(a)(3) of the NLRA if it discharged Krueger because of his union activities. See NLRB v. Transportation Management Corp., 462 U.S. 393, 398 (1983); NLRB v. Joy Recovery Tech. Corp., 134 F.3d 1307, 1314 (7th Cir. 1998); NLRB v. Dorothy Shamrock Coal Co., 833 F.2d 1263, 1266 (7th Cir. 1987). We first look to whether the NLRB's General Counsel, representing Krueger, established a prima facie case that the employer acted with an unlawful motivation. See Transportation Management, 462 U.S. at 398; Wright Line, a Div. of Wright Line, Inc., 251 NLRB 1083, 1089 (1980), enforced 662 F.2d 899 (1st Cir. 1981), cert. denied, 455 U.S. 989 (1982). If so, we then look to whether the employer was able to rebut that evidence or to show that the job action would have been taken even in the absence of the employee's protected activities. See Transportation Management, 462 U.S. at 398; Wright Line, 251 NLRB at 1089.

In this case, Jet Star first contends that the Board's decision was in error because the General Counsel failed to establish a prima facie case of discrimination. To make out a prima facie case, the General Counsel must show: (1) that the employee engaged in a protected activity; (2) that the employer had knowledge of the employee's activities; and (3) that the employer acted with anti-union animus. See Director, Office of Workers' Compensation Programs, Dep't of Labor v. Greenwich Collieries, 512 U.S. 267, 278 (1994). In order to uphold the Board's determination, we need only find that the decision is supported by substantial evidence in the record considered as a whole. 29 U.S.C. sec. 160(e); see Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Beverly Farm Found., Inc. v. NLRB, 144 F.3d 1048, 1051 (7th Cir. 1998). Under the substantial evidence standard, a court may not "dabble in factfinding, . . . [or] displace reasonable determinations simply because [it] would have come to a different conclusion if [it] reviewed the case de novo." NLRB v. Augusta Bakery Corp., 957 F.2d 1467, 1471 (7th Cir. 1992) (quoting NLRB

v. P*I*E Nationwide, Inc., 923 F.2d 506, 513 (7th Cir. 1991)).

In challenging the evidence supporting the Board's decision, Jet Star argues that the Company had no knowledge, at the time it discharged him, of Krueger's union activities following the defeat of Local 142 in the June 1996 representation election. In this regard, Jet Star notes that Krueger himself testified that he did not wear or distribute any union paraphernalia in the presence of Company officials after the election, and that he did not inform Jet Star management of his union activities nor identify himself as a union spokesperson at any Company meetings. Jet Star contends that the only hint it had of Krueger's union affiliation was his union activities prior to the certification election, and his participation as an observer in that election.

The Company's knowledge of Krueger's union activities was primarily established by dispatcher Gregory's testimony. Gregory testified that in January 1997, Terminal Manager Smith announced his intention to begin "writing up" Krueger and two other drivers who were "getting the [u]nion vote." Furthermore, Gregory stated that she overheard Smith tell Director of Operations Bell that he had to find some reason to fire Krueger. Finally, after Krueger was fired, Gregory overheard Smith say "we finally got him." This testimony as to Smith's comments is evidence that Smith had knowledge of Krueger's union activities, and strongly supports an inference that the Company's discharge of Krueger was motivated by the Company's anti-union animus. See Dorothy Shamrock Coal, 833 F.2d at 1267 (stating that "comments [that] demonstrate a 'manifest hostility' toward union activity . . . are relevant in determining the Company's motive for its conduct").

Jet Star does acknowledge that Gregory's testimony indicates knowledge of Krueger's union activities on the part of the Company, but asserts that this testimony was so incredible that the ALJ should have disregarded it. We must affirm credibility determinations made by the ALJ, and adopted by the Board, in the absence of extraordinary circumstances. See J.C. Penney Co. v. NLRB, 123 F.3d 988, 995 (7th Cir. 1997); Dilling Mechanical Contractors, Inc. v. NLRB, 107 F.3d 521, 524 (7th Cir. 1997). Such extraordinary circumstances "include a clear showing of bias by the ALJ, an utter disregard for uncontroverted sworn testimony or the acceptance of testimony which on its face is incredible." Carry Co. of Il., Inc. v. NLRB, 30 F.3d 922, 928 (7th Cir. 1994). In this case, Jet Star argues that the

ALJ's credibility determination as to Gregory's testimony was irrational and patently incredible because her testimony was manifestly contradicted by other evidence in the record.

Gregory testified that she faxed a set of Local 705's bylaws to a union supporter at a Milwaukee hotel, but that she did not know what the documents were. According to Jet Star, this testimony was contradicted by that of another Jet Star driver, Wesley Gillian, who testified that he gave Gregory the bylaws to fax and stated, "John wanted to see a copy of the bylaws." In addition, Jet Star argues that Gregory herself testified that Gillian asked her to fax a copy of the bylaws, and that she admitted during cross examination that she "faxed some bylaws of the union to a Super 8 in Milwaukee." Jet Star contends that both Gillian's and Gregory's statements contradict Gregory's assertion that she did not know she was faxing a copy of the bylaws, and that the ALJ therefore erred in finding her testimony credible.

The deferential standard of review that we apply to the credibility determinations of the ALJ is based on our desire to avoid "redetermining credibility 'on the basis of a cold record.'" Joy Recovery, 134 F.3d at 1312 (quoting Carry Co., 30 F.3d at 928). In this case, Jet Star has failed to show that the ALJ's acceptance of Gregory's testimony was irrational or patently incredible because none of the testimony cited by the Company clearly contradicts that of Gregory. Gillian's testimony indicates that he told Gregory that the document to be faxed was a copy of the bylaws, but it does not establish that Gregory in fact knew they were bylaws. And, while Gregory herself referred to the documents as bylaws, it is possible that this reference only indicates the state of her knowledge at the time she testified. Gregory's reference to bylaws does not prove that she knew the documents were bylaws at the time she faxed them, and does not demonstrate that the ALJ's credibility determination was irrational or patently erroneous.

In addition to Smith's comments about Krueger, the timing of the discharge itself supports an inference that Krueger was dismissed because of his union-related activities./2 See NLRB v. O'Hare-Midway Limousine Serv., 924 F.2d 692, 697 (7th Cir. 1991) (holding that the timing of a discharge may indicate the existence of an unlawful motive). At the time Krueger was discharged, Jet Star employees had expressed interest in renewing a campaign to unionize the Hammond facility. Furthermore, Krueger's discharge came only shortly after Smith expressed

concern about drivers who were "getting the union vote," and after he specifically stated that management needed a reason to fire Krueger. The timing of Krueger's discharge, coupled with the evidence of anti-union animus presented by the General Counsel, provides a sufficient basis for the Board's finding that Jet Star committed an unfair labor practice by discharging Krueger because of his union activities. See NLRB v. Shelby Memorial Hosp. Ass'n, 1 F.3d 550, 568 (7th Cir. 1993) (stating that an employer's discriminatory motive can be proved through circumstantial evidence); Justak Bros. & Co. v. NLRB, 664 F.2d 1074, 1077 (7th Cir. 1981) (same).

Jet Star attempts to rebut the inference that it fired Krueger based upon his union activities by arguing that it actually discharged him because of its good-faith belief that he was abusing equipment. According to Jet Star, it was not Krueger's union activities that led to his firing, but rather the damage to the trucks Krueger caused through his consistent mishandling of them. Jet Star further contends that because of his abusive treatment of equipment, Krueger would have been fired even in the absence of his union-related efforts. The Board rejected the Company's abuse of equipment rationale as a pretext, and we look only to whether there was substantial evidence in the record to support such a finding. 29 U.S.C. sec. 160(e); see Universal Camera Corp., 340 U.S. at 488; Beverly Farm Found., 144 F.3d at 1051.

In this case, Jet Star claims that it discharged Krueger because he was abusing the equipment by starting trucks in too high a gear. Yet when Smith and Mulligan allegedly saw Krueger exit the parking lot in fourth or fifth gear on March 10, 1997, Krueger was not called back to work nor was he prevented from making a second delivery that day. Moreover, Krueger was never formally warned about the potential consequences of abusing the trucks, and was discharged without even a cursory investigation into the reported misconduct. See NLRB v. Advanced Transp. Co., 979 F.2d 569, 574 (7th Cir. 1992) (holding that evidence of a cursory investigation can give rise to an inference of an unlawful motive). While this evidence is not conclusive as to Jet Star's motivation, it does provide sufficient evidentiary support for the Board's determination that the abuse of equipment rationale offered by Jet Star was a pretext to cover the fact that Krueger was discharged because of his union activities.

The Board's conclusion that the abuse of equipment justification was only a pretext is further supported by Jet Star's handling of

previous problems with employees abusing equipment. Other drivers who damaged Company trucks in minor ways were apparently not fired for their first offense. Rather, the only first-time offenders the Company did discharge were those involved in serious accidents with high degrees of damage. While the Company contends that the clutch and transmission failures involved in this case are more analogous to the major damage that led to previous dismissals, the Board disagreed. More significantly, the Board found that Jet Star failed to present any concrete evidence that it believed that Krueger's operation of the trucks led to the damage the Company claims to have sustained./3 Absent a more conclusive connection between Jet Star's dismissal of Krueger and its asserted belief that Krueger caused the damage to Jet Star's trucks, we cannot determine that the Board erred in finding Jet Star's asserted justification pretextual. See NLRB v. Thor Power Tool Co., 351 F.2d 584, 587 (7th Cir. 1965) (stating that the Board may disregard an employer's asserted justification when it "furnishe[s] the excuse rather than the reason" for the action).

Jet Star complains that even accepting the Board's pretext finding, the Board did not go on to determine whether Jet Star would have fired Krueger even had he not engaged in union activity. However, that argument is necessarily answered by our conclusion that there was sufficient evidence in the record to support the Board's determination that the Company's asserted justification was pretextual. Where the Board finds that the proffered reason for a discharge was pretextual, we cannot conclude that the discharge would have occurred in the absence of the protected activity. See Wright Line, 251 NLRB at 1089. Furthermore, the Board's pretext finding lends added support to its determination that Jet Star discharged Krueger based on his union activities. See Union-Tribune Publishing Co. v. NLRB, 1 F.3d 486, 490-91 (7th Cir. 1993); Shattuck Denn Mining Corp. v. NLRB, 362 F.2d 466, 470 (9th Cir. 1996) (stating that where an employer's stated justification is pretextual, it can be inferred "that the motive is one that the employer desires to conceal--an unlawful motive--at least where, as in this case, the surrounding facts tend to reinforce that inference"). In these circumstances, we cannot conclude that the record lacks substantial evidence supporting the Board's conclusion that Jet Star's asserted non-discriminatory rationale was pretextual.

III. Conclusion

We find that there is substantial evidence in the record to support the Board's conclusion that

Jet Star violated Sections 8(a)(1) and 8(a)(3) of the NLRA by firing Krueger because of his union-related activities. Accordingly, we deny Jet Star's request to set aside the Board's decision and order dated May 27, 1999, and enter final judgment enforcing that decision and order in full.

/1 Company Rule I(a)(4) is titled "Tampering with and/or abusing Company owned or leased equipment," and is set forth in the employee handbook. According to the handbook, a violation of Rule I(a)(4) is a major violation and the punishment for a first infraction is a minimum one-week suspension without pay or, alternatively, termination.

/2 Jet Star argues that the timing of Krueger's discharge actually supports an inference that it was not union-related. According to Jet Star, if it wanted to terminate Krueger based upon his union activities, it would have done so in November 1996 after he was observed starting the truck in too high a gear during the Safety Performance Observation. In such circumstances, an employer's decision not to terminate an employee at the first opportunity could undermine an inference of anti-union animus. Carry Co., 30 F.3d at 929 n.4; NLRB v. Newman-Green, Inc., 401 F.2d 1, 4 (7th Cir. 1968). However, at the time Guiducci conducted the SPOs, there was no indication that Jet Star was concerned about unionization. Local 142 had already been defeated, and the new union movement had not yet begun. In contrast, by March 1997, Jet Star was aware of Krueger's renewed union activities, and had reason to be concerned about potential unionization at its Hammond facility.

/3 The only evidence Jet Star presented of Krueger's mishandling of the trucks was Guiducci's testimony and notes that Krueger started the truck in too high a gear during his Safety Performance Observation, and the testimony of Smith and Mulligan that they observed Krueger exit the Company parking lot in too high a gear. Were the ALJ to have credited this testimony, Jet Star could certainly argue that the record supported its contention that Krueger was discharged for an abuse of equipment. However, the ALJ rejected this testimony as incredible, and did not believe the Company's asserted justification. Because we do not second-guess an ALJ's credibility determinations absent extraordinary circumstances, Augusta Bakery Corp., 959 F.2d at 1467, and because we do not find any such circumstances present in this case, we find no evidence in the record that supports

Jet Star's argument that its abuse of equipment
rationale was not pretextual.