**VAN VLERAH MECHANICAL, INCORPORATED, Petitioner, Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent, Cross–Petitioner.**

Nos. 96–2852, 96–2953.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 23, 1997.

Decided Dec. 2, 1997.

Larry L. Barnard (argued), Arthur E. Mandelbaum, Miller, Carson, Boxberger & Murphy, Fort Wayne, IN, for Petitioner.

Aileen A. Armstrong, Howard E. Perlstein, Susan M. Pavsner (argued), National Labor Relations Board Appellate Court, Enforcement Litigation, Washington, DC, William T. Little, National Labor Relations Board Region 25, Indianapolis, IN, for Respondent.

Before POSNER, Chief Judge, and RIPPLE and EVANS, Circuit Judges.

RIPPLE, Circuit Judge.

Van Vlerah Mechanical, Inc. ("VVM") petitions for review of a decision and order of the National Labor Relations Board. The Board has filed a cross-application for enforcement of its order. For the reasons set forth in this opinion, we deny the petition for review and grant enforcement of the Board's order.

I

BACKGROUND

This case centers on a series of events which occurred within a two-week span and

culminated in the discharge of Arden Reust from VVM. Specifically, there are four events that led an Administrative Law Judge ("ALJ") and then the NLRB to find that VVM had engaged in unfair labor practices in violation of §§ 8(a)(1) and (a)(3) of the National Labor Relations Act. We shall summarize each.

### A. Threatened Discharge of Hal DeTray

In September of 1993, VVM was installing a heating and air-conditioning system in an existing high school and its new addition in Pioneer, Ohio. This jobsite was within the territorial jurisdiction of Plumbers Local 50,[1] an Ohio-based union. However, VVM employed at the Pioneer jobsite not only members of Plumbers Local 50 but also members of Plumbers Local 166,[2] an Indiana-based union. On September 2, 1993, Bill Flowers, the business agent for Plumbers Local 50, visited the site and found that only one of three employees on the job that day was a member of Plumbers Local 50. That employee was Hal DeTray. The other two employees, Arden Reust and Bill Haines, were members of Plumbers Local 166. Flowers questioned Haines' right to work on the site and warned him that he should not come back the next day. He also ordered DeTray to inform him if any member of Local 166 worked on the Pioneer job.

Following Flowers' departure from the site, Reust, the foreman, called James Van Vlerah, the vice-president and 49% shareholder of VVM, to inform him of the incident. According to Reust, Van Vlerah told him to tell DeTray to "keep his mouth shut" or he would be fired. *Van Vlerah Mech., Inc.*, No. 25–CA–22810, 1996 WL 41274, at *4 (N.L.R.B. Jan. 31, 1996). In addition, Reust claimed that Van Vlerah expressed his intention to "go nonunion" if he continued to have difficulty with the unions. *Id.* After this conversation with Van Vlerah, Reust informed DeTray and Haines of Van Vlerah's remarks. Van Vlerah, however, denies that he ever threatened DeTray's employment.

### B. The Apprenticeship Status of Pierre Jacquay

This incident involved a problem regarding the apprenticeship status of Pierre Jacquay, one of the first employees of VVM and a close personal friend of Van Vlerah. As part of the apprenticeship program, Jacquay was required to submit to the Joint Apprentice Committee ("JAC") employer evaluations concerning the on-the-job training component of his apprenticeship. Although Jacquay submitted these evaluations in a timely fashion, he violated JAC rules by signing the evaluations himself. When he discovered that Jacquay had been signing his own evaluation forms, Leonard LaBundy, the director of the JAC, called in Jacquay for a meeting and informed him that the absence of proper documentation could affect Jacquay's eligibility to be referred for work to VVM or to any other employer. A few days after this meeting, on September 14, 1993, Van Vlerah called LaBundy and asked why the JAC was trying "to screw over Jacquay." *Van Vlerah Mech., Inc.*, 1996 WL 41274, at *5. Later in that conversation, Van Vlerah told LaBundy that "if the contractors were going to screw over Pierre, he would have to consider going nonunion." *Id.*

### C. The "Temptation" of Arden Reust

On September 21, 1993, Reust returned to VVM's shop after work and was approached by Van Vlerah. According to Reust, Van Vlerah told him that the union was picking on Jacquay again and also remarked that VVM had just given the union another $60,000 in benefit payments. Reust contends that Van Vlerah then asked him if he would work without a union affiliation if VVM paid him $80,000. Reust, who was earning $45,000 at that time, shrugged off Van Vlerah's proposal. Van Vlerah persisted, however, and asked Reust whether the union had ever done anything for him. Reust replied that the union had gotten him a job when he needed one and that, without the union's help, he would not be getting his present

---

1. The full name of Plumbers Local 50 is the United Association Local No. 50 Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada.

2. The full name of Plumbers Local 166 is Plumbers and Steamfitters Local Union No. 166, a/w United Association of Journeymen and Apprentices of the Plumbing and Pipefitting Industry of the United States and Canada, AFL–CIO.

compensation or benefits. Undeterred, Van Vlerah persisted in his offer to Reust by noting that, if VVM did not have to make benefit payments to the union, it could pay Reust and a few other good men more money and then hire the bulk of its work force "off the street." *Van Vlerah Mech., Inc.*, 1996 WL 41274, at *5. Reust expressed skepticism about this proposed arrangement and started to leave. Van Vlerah called after him: "Well, it's going to happen. Not real soon, but I will go nonunion." *Id.* Van Vlerah, however, denies ever offering Reust an $80,-000 salary to abandon his union membership.

### D. *The Discharge of Arden Reust*

As part of the Pioneer job, VVM was required to complete a tie-in of an existing underground gas line to the newly constructed addition to the Pioneer school. In order to complete this tie-in, the incoming gas supply had to be shut off. The gas was turned off on September 29, 1993 at 12:30 p.m. and was scheduled to be turned on the following morning at 9:30 a.m. in order to ensure the proper heating of the classrooms for the day's session. Reust, as the working foreman on the job, was responsible for accomplishing this tie-in within the allotted time frame. After the tie-in was accomplished, Reust installed a chart recorder to ascertain whether the connection could withstand the required pressure over an allotted period of time. When the test seemed to be working, he left for home and, on the way, reported to Van Vlerah that the project seemed to be satisfactory and that definitive results would be known in the morning.

Reust returned to the jobsite the following morning at 7 a.m. and found that the test pressure in the new lines had dropped significantly. That drop in pressure indicated a leak somewhere in the pipeline. A leak in the line was repaired and further work on the gas company's meter was ordered. The pressure appeared to be holding in the line at the usual quitting time; Reust therefore left the jobsite. On the way home, he stopped at VVM's facility to report the situation. At that time, he reported the problems at the Pioneer job to Karen Van Vlerah, also a VVM officer.

On the following morning, the pressure again had dropped in the line and further work was performed. At approximately 11 a.m., Tom Kirkwood, one of Reust's designated superiors, arrived at the jobsite. Kirkwood had designed the Pioneer heating and air-conditioning system and supervised its installation. Together, Reust and Kirkwood made preparations to reroute the gas line in order to fix the problem. They also determined that the remainder of the work should be completed the next day. That evening, Reust again discussed the situation with Karen Van Vlerah. Later that evening, James Van Vlerah, who had visited the jobsite and claimed that he had not been informed of the problem, called Reust at home and fired him.

Van Vlerah testified that he fired Reust because of the Pioneer job delay and his belief that Reust, as the foreman on the job, was responsible for that delay. He also testified that, over the course of the years, there had been other problems, although none of sufficient gravity to justify a written record. He mentioned "piping practices that were wrong" and "poor judgment calls at times." *Van Vlerah Mech., Inc.*, 1996 WL 41274, at *6. Van Vlerah also cited the fact that the engine of the company truck Reust was driving "blew up" in September 1993. *Id.* Van Vlerah held Reust responsible for the damage to the truck because the repair shop mechanics had told him that the person driving the truck should have heard the engine pounding. Notably, however, Van Vlerah, in an affidavit submitted to the Board prior to the hearing, stated that Reust had a severe hearing problem and thus might not have been able to hear the engine pounding. Moreover, Reust received no discipline regarding this incident.

### E. *The Administrative Proceedings*

As a result of the events described above, Plumbers Local 166 filed a charge against VVM with the NLRB. On October 11 and 12, 1994, a hearing was held before an ALJ. Based on the evidence presented at that hearing, the ALJ found that VVM, by virtue of the conduct of Van Vlerah, violated § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), which prohibits an employer from interfering with, restraining, or coercing employees in the exercise of their

statutory right to engage in concerted activity. Specifically, the ALJ found that Van Vlerah violated § 8(a)(1) when he threatened to terminate DeTray if the latter followed the orders of his union superior. The ALJ also found a violation of § 8(a)(1) in Van Vlerah's interrogation of Reust about his union sympathies and in Van Vlerah's solicitation of Reust to abandon support for the union by a promise of higher wages and benefits.

The ALJ also found that VVM violated both § 8(a)(1) and (a)(3) of the Act by discharging Reust on account of his pro-union sympathies. Section 8(a)(3) makes it an unfair labor practice for an employer to discriminate "in regard to hire or tenure of employment or any term or condition of employment to ... discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). In reaching this conclusion, the ALJ gave significant weight to the timing of the firing and concluded that Reust's pro-union sympathies were a motivating factor in Van Vlerah's decision to terminate Reust. The ALJ was not convinced that, absent his pro-union sympathies, Reust would have been terminated because of his handling of the gas leak at the Pioneer site. The ALJ found that the credible evidence established that Reust had performed his duties professionally at the Pioneer jobsite and had reported appropriately the situation to management. The ALJ also noted that the evidence belied Van Vlerah's assertion that the decision to discharge Reust had been based on the aggregation of other difficulties. He noted that Reust had been considered a good employee, had received several privileges such as the use of a company truck and had been promoted to working foreman in May 1992. Indeed, noted the ALJ, he had never received any discipline until he rejected Van Vlerah's offer of nonunion employment.

The ALJ based his conclusions on the testimony of Reust and the other witnesses presented by the General Counsel. He specifically found the testimony of these witnesses to be credible. On the other hand, he found that the testimony of Van Vlerah and some of the other witnesses called by VVM was inconsistent, evasive and contradictory.

On January 31, 1996, the NLRB affirmed the ALJ's rulings, findings and conclusions and adopted, with a minor modification, the ALJ's recommended order.

## II

## DISCUSSION

### A.

■ The standard governing our review of unfair labor practice proceedings before the Board is well established. "We will uphold the Board's order if 'substantial evidence on the record as a whole supports its factual findings and if its conclusions have a reasonable basis in the law.'" *Dilling Mech. Contractors, Inc. v. NLRB*, 107 F.3d 521, 523–24 (7th Cir.) (quoting *Carry Cos. of Illinois v. NLRB*, 30 F.3d 922, 926 (7th Cir.1994)), *cert. denied*, — U.S. —, 118 S.Ct. 165, — L.Ed.2d — (1997).

■ The applicable substantive standards are also well established. Section 7 of the National Labor Relations Act, 29 U.S.C. § 157, guarantees employees the right to self-organization by forming, joining or assisting labor organizations. Section 8(a)(1) of the Act, 29 U.S.C. § 158(a)(1), protects this right by making it an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." It is therefore an unfair labor practice to threaten an employee with shop closure or with discharge or to interrogate coercively an employee in order to discourage union activities. *See NLRB v. Q–1 Motor Exp., Inc.*, 25 F.3d 473, 477 (7th Cir.1994), *cert. denied*, 513 U.S. 1080, 115 S.Ct. 729, 130 L.Ed.2d 633 (1995); *Central Transp., Inc. v. NLRB*, 997 F.2d 1180, 1189 (7th Cir.1993). Similarly, it is an unfair labor practice to grant or even to promise a wage increase or other benefit in order to discourage an employee's support of a union. In determining whether an employer's activities are forbidden by the Act, the appropriate inquiry is whether those actions "'reasonably tended to interfere with or coerce employees in the exercise of their protected rights.'" *See Carry Cos.*, 30 F.3d at 934 (quoting *Weather Shield Mfg., Inc., Millwork Div. v. NLRB*, 890 F.2d 52, 56 (7th Cir.1989)). The words used by the employer, as well as the

context in which they were conveyed, must be examined. *See Midwest Stock Exch., Inc. v. NLRB,* 635 F.2d 1255, 1267 (7th Cir.1980). In determining what an employee reasonably might have inferred from a communication, the Board must consider the economic dependence of the employee on the employer and the concomitant tendency of the employee "to pick up intended implications ... that might be more readily dismissed by a more disinterested ear." *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 617, 89 S.Ct. 1918, 1942, 23 L.Ed.2d 547 (1969); *see also NLRB v. Shelby Memorial Hosp. Assoc.,* 1 F.3d 550, 559–60 (7th Cir.1993).

■■■ Section 8(a)(3) of the Act, 29 U.S.C. § 158(a)(3), makes it an unfair labor practice for an employer to discriminate against employees with regard to hire or tenure of employment in order to discourage membership in a labor organization. In evaluating such an allegation, the Board must determine the employer's motivation in taking a particular action. This determination often must be made on the basis of circumstantial evidence. When an employee's statutorily protected activity was a motivating factor in the discharge or other adverse employment action, a violation of the Act has been established unless the employer demonstrates that it would have taken the same action in the absence of the employee's protected activity. *See NLRB v. Transportation Mgt. Corp.,* 462 U.S. 393, 399, 103 S.Ct. 2469, 2473, 76 L.Ed.2d 667 (1983); *Carry Cos.,* 30 F.3d at 927. We shall not " 'displace the Board's choice between two fairly conflicting views, even though [we] would justifiably have made a different choice had the matter been before [us] de novo.' " *NLRB v. Bliss & Laughlin Steel Co.,* 754 F.2d 229, 234 (7th Cir.1985) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951)).

### B.

■■■ There is substantial evidence on the record as a whole supporting the Board's finding that VVM violated § 8(a)(1) of the Act by virtue of Van Vlerah's threat to fire DeTray if he complied with the instructions of his union superior.

■■■ VVM does not argue that the alleged conduct, if it occurred, would not constitute a violation of § 8(a)(1). Rather, it contends that the ALJ erred in crediting Reust's testimony. In order to succeed with this argument, VVM must overcome a formidable hurdle. Indeed, we have said that " 'credibility determinations are to be made by the ALJ and the Board and will not be overturned by a reviewing court absent extraordinary circumstances.' " *NLRB v. Augusta Bakery Corp.,* 957 F.2d 1467, 1477 (7th Cir.1992) (quoting *NLRB v. Illinois–American Water Co. Southern Div.,* 933 F.2d 1368, 1374 (7th Cir.1991)). Moreover, "where there are two materially conflicting versions of the same incident, an ALJ's credibility determinations are entitled to deference." *Carry Cos.,* 30 F.3d at 928; see also *J.C. Penney Co. v. NLRB,* 123 F.3d 988, 995 (7th Cir.1997) (stating that ALJ's resolution of "swearing match" is entitled to great deference).

The situation before us hardly constitutes an "extraordinary circumstance." Reust testified about Van Vlerah's threat to terminate DeTray. That testimony was corroborated by the credited testimony of DeTray and two other employees. The ALJ made specific credibility determinations which are entitled to deference. The ALJ was entitled to believe these witnesses and not Van Vlerah.

### C.

■■■ There is also substantial evidence on the record taken as a whole to support the Board's determination that VVM violated § 8(a)(1) of the Act on account of Van Vlerah's interrogation of Reust and his attempt to entice Reust into working as a nonunion employee at a higher salary and with better benefits.

We cannot accept the submission of VVM that the testimony of Reust is inherently incredible. It was the task of the Board, not this court, to evaluate VVM's argument that it would have made no sense for Van Vlerah to choose Reust to lead the movement to go nonunion because Reust was not a union officer and not the type of person who could rally other employees to join an effort to de-unionize. Likewise, it was the Board's prerogative to accept or reject VVM's argument

that, in light of VVM's contracts with three unions, Van Vlerah would not assume that Reust could convince members of other unions to de-unionize. Similarly, it was for the Board to evaluate the argument that, given that at least a third of VVM's business was tied to a unionized General Motors plant, Van Vlerah would never consider going nonunion. All of these matters are credibility judgments within the province of the Board. Here, the ALJ made specific findings supporting his decision to credit the testimony of Reust. As we have already noted, we shall not overturn the credibility determinations of the ALJ absent extraordinary circumstances. No such circumstances exist here.

### D.

There is also substantial evidence on the record as a whole to support the Board's determination that VVM violated §§ 8(a)(1) and 8(a)(3) of the Act by discharging Reust because of his union activities. The Board was entitled to rely upon inferences drawn from circumstantial evidence. *See NLRB v. O'Hare–Midway Limousine Serv.*, 924 F.2d 692, 697 (7th Cir.1991). Circumstantial evidence suggesting anti-union motivation includes the timing of the discharge, the employer's reliance on pretextual justifications and the employer's antiunion bias as demonstrated, for example, by other contemporaneous violations of the Act. Once it is established that an employee's statutorily protected activity was a motivating factor in his discharge, the burden is on the employer to show that the same action would have been taken in the absence of the employee's protected activity. *NLRB v. Transportation Mgt. Corp.*, 462 U.S. 393, 399, 103 S.Ct. 2469, 2473, 76 L.Ed.2d 667 (1983). In addition, as we noted earlier, this court has recognized that the Board is particularly well suited to analyze cases of unlawful discrimination and has said that it will not "displace the Board's choice between two fairly conflicting views, even though [we] would justifiably have made a different choice had the matter been before [us] de novo." *NLRB v. Bliss & Laughlin Steel Co.*, 754 F.2d 229, 234 (7th Cir.1985) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464–65, 95 L.Ed. 456 (1951)).

Here, the Board was entitled to conclude that Reust was discharged because of his union activities. First, the timing of the discharge supports the Board's decision. Reust was a trusted and valuable employee who had never been disciplined until he refused Van Vlerah's unlawful offer to help VVM go nonunion. Almost immediately after that offer, Reust received his first verbal warning and then one week later he was discharged. Second, Van Vlerah's expressions of anti-union animus near the time of Reust's discharge were unrestrained. In the weeks leading up to Reust's discharge, in addition to his attempt to lure Reust away from the union, Van Vlerah threatened to go nonunion and also threatened to fire one employee (DeTray) for engaging in union activities. The Board was entitled to find that Van Vlerah's expressed reasons for discharging Reust were inconsistent, evasive and shifting. The Board also was entitled to conclude that Reust had handled the unexpected difficulties at the Pioneer jobsite in a professional and competent manner and that he had notified his superiors of the problems he was experiencing. Thus, substantial evidence in the record supports the conclusion that VVM's proffered reason for Reust's dismissal is pretextual.

### Conclusion

This case comes down to a determination of whether the record contained sufficient evidence to support the factual determinations of the Board. Indeed, to a great extent, the decision of the Board is based upon the credibility determinations of the ALJ and, as we have already noted, these matters are not open to relitigation here in the absence of extraordinary circumstances. Accordingly, the petition for review is denied and the order of the Board is enforced.

PETITION FOR REVIEW DENIED; ORDER ENFORCED.