In the
United States Court of Appeals
For the Seventh Circuit

Nos. 00-1329 & 00-1599

6 WEST LIMITED CORPORATION and
LETTUCE ENTERTAIN YOU ENTERPRISES, INC.,
doing business as TUCCI MILAN,

Petitioners/Cross-Respondents,

v.

NATIONAL LABOR RELATIONS BOARD,

Respondent/Cross-Petitioner.

On Petition for Review and Cross-Application
for Enforcement of Orders of
the National Labor Relations Board
Nos. 13-CA-32908, 13-CA-32971, 13-CA-33047, 13-CA-33455.

Argued September 27, 2000--Decided January 10, 2001

Before POSNER, COFFEY, and KANNE, Circuit Judges.

COFFEY, Circuit Judge.  Tucci Milan/1 (Tucci)
was the focus of a union organizing drive/2 in
the fall and winter of 1994. After Tucci's
employees voted against union representation, the
National Labor Relations Board (NLRB) determined
that Tucci's pre-union vote conduct violated the
National Labor Relations Act (NLRA)./3 Tucci
appeals, and we grant its petition for review,
deny the General Counsel's cross-petition for
enforcement, and vacate the decision of the NLRB.

I.  BACKGROUND

   The events leading up to the NLRB's conclusion
that Tucci violated the NLRA began in late August
or early September 1994, when Jeff Kozak, the
general manager of Tucci, discovered that someone
had withdrawn numerous pages from the manager's
log./4 When Kozak discovered that the log was
missing some pages, he questioned those employees
whom he believed had access to the office if they
knew the whereabouts of the missing pages,
including the weekday and weekend managers, the
restaurant's chef, the managing partner (Howard
Katz), the former general manager (Steve
Schwartz), Richard Melman (president of LEYE), as

well as all of Tucci's other managers. Not one of them admitted having any knowledge of the whereabouts of the missing pages. At that time, management neither suspected theft nor that any of the employees might have been involved despite the fact that the employees were occasionally given keys to the office to use the photocopier. After the questioning of the individuals whom he believed had access to the log bore no results, Kozak set the matter aside and took no further investigatory actions.

In the summer of 1994, 19 Tucci employees met at the shared residence of servers Brian Gibson and Jill Ricci to discuss various work-related problems they perceived at the restaurant, including health and safety conditions, the alleged lack of effectiveness of Tucci's grievance resolution mechanism, and the distribution of tips received at a large 1993 Christmas party. Attendees at the meeting were shown, but not given, a copy of a document entitled "Constructive Criticism" which consisted of a cut-and-paste compilation of comments taken from the manager's log denigrating employees and customers./5 As the attendees discussed the contents of the "Constructive Criticism" document, Brian Gibson and Greg Calvird suggested that they call the Union and inquire into their rights. Within one week of the meeting, Gibson and Calvird met with Union Representative Terry Maloney to discuss employee complaints, the benefits of union representation, and the mechanics of organizing Tucci employees.

Shortly afterwards, in September 1994, a second meeting of Tucci employees was held at the Gibson-Ricci residence. About seven employees including Brian Gibson, Jill Ricci, Greg Calvird, Gretchen Grant, Elaine Gonzales, and Sarkis Akmakjian attended. At this time, those employees in attendance signed union authorization cards and went about forming a union organizing committee. In addition to attending union meetings, these committee members encouraged other Tucci employees to attend union meetings through conversations in and outside the restaurant, including telephone calls to employee's homes.

Gibson, Ricci, Gonzales, Akmakjian, and Calvird invited other Tucci employees to attend a union organizing meeting on Saturday, October 8, 1994, at a bar located across the street from Tucci Milan. During this meeting, Gibson talked about the necessity of having union representation and distributed copies of the "Constructive Criticism" document. During the meeting, Ken Schrader, a Tucci bartender, recognized the document as part of the manager's log. Schrader

became volubly upset and repeatedly characterized the document as stolen property. When Schrader asked Gibson the source of the logs, Gibson first responded "you don't want to know." But, when pressed further, Gibson replied "it's amazing what you can find in the garbage." According to Schrader, a "sly smile" accompanied Gibson's explanation./6

Schrader gave his copy of "Constructive Criticism" to Kozak and informed both Kozak and Katz that Gibson was distributing cut-and-paste compilations of the manager's log to Tucci employees in an effort to form union representation. A week later, Schrader reiterated the story to Jacqui Glasby, an employee relations specialist for Tucci Milan.

A.   Gibson's Termination

At a regular employee meeting on Tuesday, October 11, 1994, Katz announced that he had been informed that parts of the manager's log had been stolen, and that the police had been contacted./7 Two Chicago police officers arrived at the close of the meeting and completed a police report concerning the missing pages of the manager's log with Katz in a separate room.

Gibson did not report to work the next day and contacted Glasby claiming that Katz had threatened employees with an INS immigration raid. When Glasby asked if that was the true reason for Gibson's call, Gibson stated that he knew his rights. After that, Gibson contacted union agent Maloney. Maloney concluded that management knew about Gibson's union involvement and suggested that Gibson prepare a written statement announcing his union organizing activities.

Gibson returned to work on October 15, 1994, and was immediately confronted by General Manager Kozak and Managing Partner Katz who requested a meeting with him. Before the three men went into the manager's office, Gibson requested the presence of two witnesses. Upon Gibson's request, Kozak and Katz permitted Gibson to bring Calvird and Grant into the meeting. Once in the office, Gibson read his prepared statement announcing his union organizing activities. Katz responded that he was unaware of any union organizing efforts and stated that the meeting had nothing to do with union activities. Katz went on and explained to Gibson that he did not call in before 8:00 a.m. when he failed to report to work on October 12, 1994, as set forth in the employee manual. Katz further expressed concerns about Gibson's failure to share his tips with other employees ("tip-out") after his shift on Tuesday, October

11, 1994./8 Katz then informed Gibson that he had been seen passing out stolen compilations of the manager's log and asked Gibson if he had stolen the manager's log. But, Gibson refused to admit to either passing out copies of the stolen documents or stealing the logs. Gibson was informed that the determination of the theft question would be handled by a police investigation and that he would be suspended pending the outcome of the investigation./9

Gibson called Glasby in Las Vegas on November 4, 1994, to inquire about a rumor circulating in the restaurant that he had been permanently fired. Glasby informed Gibson that he would receive a final termination letter in the mail, and when Gibson asked why he had been discharged, Glasby stated that he told "too many stories" about the missing portions of the manager's log, and that he was "not loyal to the Company." Shortly thereafter, Gibson received his final termination in a letter dated November 3, 1994, which stated:

This is to advise you that your suspension, which commenced October 15, 1994 has been converted to termination effective as of this date. We have taken this action because we have concluded that your explanation concerning your role in the unauthorized removal of company records is not credible./10

B.  Tucci Hostility Toward The Union

1.  Increased Security

Kozak testified that prior to the union organizing campaign, Tucci hired the services of WBE Security to provide the services of one off-duty, plain-clothed Chicago policeman on Friday and Saturday nights to ensure the safety of customers and employees. However, after the union organizing activities commenced in early October, security coverage increased to one security officer every night of the week. Kozak testified that he expanded the security arrangement after the manager of a neighboring Ruth's Chris restaurant told him that the same union agents, Terry Maloney and the union president, were responsible for creating two disturbances at Ruth's Chris restaurant which required police intervention.

2.  The Solicitation Discipline

The Tucci Milan restaurant provides a handbook of rules to its employees that contains the following prohibition against solicitation and distribution:

SOLICITATION AND DISTRIBUTION OF MATERIALS

1. DISTRIBUTION BY EMPLOYEES AT WORK

No employee may distribute literature of any kind in work areas at any time before, during or after the work day. This rule does not apply to non-work areas.

No employee may solicit another employee to join or support any endeavor or project during his own work time anywhere on Company property; nor may any employee solicit another employee during that employee's work time. This rule does not apply to non-work (free) time, such as breaks and meal breaks.

Ricci, while on the restaurant's premises on November 3, 1994, spoke with three other employees about an upcoming union meeting and suggested that they attend. After some of the employees informed management that they were uncomfortable about being solicited, Ricci was given a written warning concerning her violation of Tucci's solicitation policy. Similarly, Calvird and Grant, also union supporters, were given written warnings after employees also complained about their attempts at union membership solicitation.

However, in the past, Grant, Ricci, and Calvird had all solicited customers and employees. For example, Ricci had sold hand-painted bottles to employees and customers while working at the restaurant. Grant had purchased theater tickets, raffles tickets, and girl scout cookies. Finally, Calvird displayed and sold hand-made Christmas ornaments at the restaurant in December 1993.

3. The Bomb Threat

At an employee meeting in December of 1994, management questioned employees about a letter that had been sent on union stationery to a number of Tucci Milan's frequent diners. The letter informed the frequent diners that they might be asked to rate server performance for management and might be subpoenaed to testify in a court proceeding. Naturally, Tucci management was very upset over the contents of this letter and asked the employees present at the meeting if anyone knew who was responsible for the letters. Ricci responded that she did not feel that any employee had written the letter because the letter did not address the concerns that first led some of the employees to contact the Union.

After the meeting, Ricci returned to the restaurant and was asked by Kozak what she

thought of the meeting and the letter. Ricci informed him that if the letter had come from the Union she would be very upset and that she intended to contact the Union before she returned to Rhode Island for the Christmas holiday. However, she journeyed to Rhode Island the next day without contacting the Union.

At approximately 9:30 p.m. on the same night, Ricci's roommate, Gibson, answered the telephone at their residence. The caller asked Gibson if he could "fry eggs on Jill's car," and told him that he would see him in jail, and threatened to sodomize him. Gibson hung up and reported the substance of the call to Ricci. Ricci then returned the call by dialing *69 on the telephone. When the caller answered the phone, Ricci asked "who is this," and a male voice responded "who the f . . . is this." Ricci told him that she was the person whose house he had just called, told him to never call there again, and hung up the telephone. Within several minutes, the same caller telephoned. The male caller threatened that he knew where they lived and that he would come to their house and blow it up.

That night, Gibson and Ricci contacted the police and had the call traced./11 The next morning, before leaving for Christmas vacation, Ricci informed an assistant manager at Tucci of the threatening phone calls she and Gibson received, but stated that the identity of the caller was unknown.

A few days later, Kozak held an employee meeting and informed them that he had something to tell them about Ricci. Kozak informed the employees that Ricci had been upset about the union letter sent to Tucci Milan's frequent diners and that she had gone to the union office to confront the Union about the letter and to tell them that she had no interest in being involved with them anymore. Kozak then told the employees that Ricci suspected that the Union had threatened to blow up her house. Finally, Kozak told the employees that Ricci had left town out of fear and that the employees should be very careful before they got involved with an organization like that. However, one of the employees spoke up and stated that she did not believe the Union had threatened Ricci and that Ricci had merely left town to visit her parents and not out of any fear for her life.

C.  Coercion and the Solicitation of Grievances

Two Tucci servers, Akmakjian and Gonzales, testified that they received visits from Melman, the founder and president of LEYE, and Haskell,

a senior vice president in the LEYE organization. According to Akmakjian's testimony, Melman and Haskell visited the restaurant almost daily in the week preceding the election whereas he had observed the two men in the restaurant only a couple of times a year prior to the union campaign. Akmakjian also testified that three days before the election Melman promised to re-open his inquiry into a disputed tip issue at a 1993 Christmas party and remove a reporting-for-work-late warning from Akmakjian's personnel file./12 Gonzales testified that on the evening prior to the election, Haskell sought her out and raised a number of issues with her and promised to re-open the investigation into a prior injury Gonzales sustained on the job as well as the same 1993 Christmas party tip issue Akmakjian had complained about.

D.  The Charges/13

  On October 17, 1994, Gibson filed a complaint with the NLRB alleging that his suspension and termination were in violation of the NLRA. Specifically, Gibson argued that he was suspended and eventually terminated because of Tucci's animus against his protected union activities. Additionally, Jill Ricci filed a second case against Tucci on November 7, 1994, alleging that: 1) the restaurant had disciplined her because of her protected union activities; 2) employee Greg Calvird was also disciplined by Tucci for engaging in protected union activities; and 3) the restaurant unlawfully applied its non-solicitation policy when disciplining her and Greg Calvird because of their involvement with the Union. Ricci also alleged that she and her roommate, Gibson, had received a phone call threatening to blow up their house and that Kozak, in violation of the NLRA, announced to the restaurant's employees that the bomb threat was from the Union and that Ricci, frightened, had been forced to leave Chicago. In a separate case, Tucci server Gretchen Grant also alleged that the restaurant unlawfully applied its non-solicitation policy when disciplining her for soliciting union support./14

E.  The ALJ and NLRB

  1.  Gibson's Discharge

  On November 5, 1997, Administrative Law Judge Thomas R. Wilks found that Tucci violated sections 8(a)(3) and (1) of the NLRA when it suspended and discharged Brian Gibson because of his union and other concerted, protected activities. According to the ALJ, the fact that Tucci took no action with regard to the missing log until after it was used in a union organization effort and that Gibson was never charged with the theft of the missing log,

leads one to the conclusion that Gibson's termination was based on nothing "more than a thinly premised suspicion that Gibson may have been somehow involved in the use, if not the acquisition, of confidential documents."

Two of the three NLRB members sitting in review of the ALJ concluded that even though the ALJ "may not have accurately characterized [Tucci's] stated reason for discharging Gibson," sufficient evidence existed to support the ALJ's finding that Tucci violated the NLRA when it discharged Gibson. The two members of the Board reached this conclusion because Tucci did not have a formal, written policy stating that it would "discharge an employee who failed to give credible answers in an investigation of missing property." The dissenting board member picked up on this peculiar reasoning and stated that there was no need for an employer to have a formal, written policy stating that it would terminate an employee who failed to give credible answers. Rather, according to the dissenting judge, common sense mandates that employers be allowed to discharge employees who give less than credible answers during the course of an investigation into stolen property.

2. Tucci Hostility Toward the Union

   a. increased security

According to the ALJ, "[t]here is no clear, convincing, conclusive evidence that any identifiable security officer did anything that would be suggestive of surveillance of employees as they engaged in any attempted union activities." Rather, the fact that Tucci managers had learned of the problems associated with the union president and its agent at a local restaurant, supported Tucci's "reasonable business motivation . . . for additional security."

The two-member majority of the Board agreed with the ALJ that there was no persuasive evidence that Tucci's security officers engaged in any actual surveillance of those employees suspected of engaging in union activities. However, the majority concluded that the expansion from one security officer two nights a week to one security officer every night of the week was coercive and violated section 8(a)(1) of the NLRA because, according to the two Board members, Tucci's increased use of security guards during the organizing campaign was part of a coercive strategy to disparage the Union and to frighten employees into withdrawing their support for the Union.

The dissenting Board member disagreed with the majority's finding regarding Tucci's increased security measures and concluded, like the ALJ, that the increase in security was a reasonable business action in response to information from a credible source concerning union misconduct that took place at a local restaurant. According to the dissenting Board member, the ALJ's finding in this regard was supported by the evidence and should not be disturbed because there was no evidence in the record tending to demonstrate that the increase in security had a coercive effect on the employees' union activity.

### b. the solicitation discipline

According to the ALJ, Tucci also violated the NLRA when it disciplined Gretchen Grant, Jill Ricci, and Greg Calvird for soliciting union support while at work. The ALJ rested his decision on the fact that Tucci management had allowed past solicitation, such as the selling of girl scout cookies, hand-blown glass Christmas decorations, and hand-painted bottles. The ALJ concluded that the restaurant impermissibly discriminated against the Union when it disciplined the three employees for soliciting union support when it had allowed others to solicit without punishment. All three members of the Board agreed with the ALJ on this point.

### c. the bomb threat

With respect to Kozak's claim that the bomb threat Ricci received was an act of the Union, the ALJ concluded:

In this case, Kozak's statement that Ricci fled the city because she had been threatened by the Union was so completely unfounded that if it did not constitute an intentional lie, it was so reckless and irresponsible as to warrant the same sanction. I find that Kozak's remarks patently conveyed to the employees that they were in a real and immediate danger from union violence. I find that the objective tendency of such remarks was to cause fear, confusion and dissension in the ranks of possible prounion voters and solidify antiunion voters in the upcoming election./15

### 3. Solicitation of Grievances

The ALJ found that although senior vice president, Charles Haskell, and the president and founder of LEYE, Richard Melman, solicited grievances from employees Sarkis Akmakjian and

Elaine Gonzales in early January 1995, this conduct was lawful because it did not differ significantly from previous actions under the multifaceted grievance procedure maintained by Tucci. The two-member majority of the Board disagreed with the ALJ and concluded that

high-ranking members of management not only initiated discussions of employee problems, but also agreed to revisit "closed cases," both implicitly and explicitly promising to remedy the problems. Under these circumstances, we find that [Tucci management] was not engaged in following its preexisting grievance procedure or a comparable process and that its preelection promises to reopen previously resolved matters constituted the unlawful solicitation of grievances.

The dissenting Board member initially noted that the mere fact that high-ranking Tucci officials visited the restaurant during the week before the election was not in and of itself a violation of the NLRA. He went on to conclude that once high-ranking officials were present at the restaurant, it was only natural that they would address specific employee concerns. Finally, the dissent concluded that there was no evidence that the high-ranking officials from the restaurant "solicited grievances and promised to remedy them as an inducement for employees to abandon the Union."

II.  ISSUES

On review, we consider whether Tucci violated the NLRA when it: 1) terminated Gibson; 2) hired additional security; 3) issued employees written warnings for soliciting union support; 4) attributed a bomb threat to the Union; or 5) allowed high-ranking officials to address employee grievances.

III.  DISCUSSION
A.  Standard of Review

The standard governing our review of unfair labor practice proceedings before the Board is well established. "We will uphold the Board's order if 'substantial evidence on the record as a whole supports its factual findings and if its conclusions have a reasonable basis in the law.'" Dilling Mech. Contractors, Inc. v. NLRB, 107 F.3d 521, 523-24 (7th Cir. 1997) (quoting Carry Cos. of Illinois v. NLRB, 30 F.3d 922, 926 (7th Cir. 1994)).

B.  Gibson's Discharge

The applicable substantive standards this court

applies are also well established. Section 7 of the National Labor Relations Act, 29 U.S.C. sec. 157, guarantees employees the right to self-organization by forming, joining, or assisting labor organizations. Section 8(a)(1) of the Act, 29 U.S.C. sec. 158(a)(1), protects the right of employees to unionize by making it an unfair labor practice "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title." Therefore, management may not threaten an employee with shop closure or with discharge nor may an employer interrogate coercively an employee in order to discourage union activities. See, e.g., Van Vlerah Mechanical Inc. v. NLRB, 130 F.3d 1258, 1262 (7th Cir. 1997); NLRB v. Q-1 Motor Exp., Inc., 25 F.3d 473, 477 (7th Cir. 1994); Central Transp., Inc. v. NLRB, 997 F.2d 1180, 1189 (7th Cir. 1993). However, as we stated in Carry Companies of Ill. v. NLRB, 30 F.3d 922, 926 (7th Cir. 1997),

union activism is not an impenetrable shield against discharge, and the Act "does not give union adherents job tenure." Chicago Tribune, 962 F.2d at 716 (quoting NLRB v. Loy Foods Stores, Inc., 697 F.2d 798, 801 (7th Cir. 1983)). A company is free to discharge its employees "for good, bad, or no reasons, so long as its purpose is not to interfere with union activity." Loy Foods, 697 F.2d at 801.

The Board concluded that Gibson's discharge violated the NLRA because Tucci did not establish that it would have fired Gibson absent his union support. In reaching this conclusion, the Board relied on the fact that Tucci did not have an express, written policy stating that it "would discharge an employee who failed to give credible answers in an investigation of missing property." We find this logic specious.

No company needs to have a set procedure for what action it will take when adjudicating every single employee problem. It is also obvious that, at a bare minimum, companies must be able to trust their employees and be assured that no one is stealing documents from offices or private files. It is also obvious that companies must be able to discharge a thief or an untruthful employee. In fact,

[f]alse statements impair the employer's ability to make sound judgments that may be important to the employer's legal, ethical and economic well-being. So, an employer is entitled to expect and to require truthfulness and accuracy from its employees in an internal investigation that is exploring possibly improper conduct in the business's own workplace. . . . Therefore, an

employer, in these situations, is entitled to rely on its good faith belief about falsity, concealment, and so forth.

EEOC v. Total System Services, Inc., 221 F.3d 1171, 1176 (11th Cir. 2000).

The Board's reliance on the absence of any formal policy requiring honesty is not only misplaced legally, but divorced from the real world, and an example of skewed and position-oriented decision-making without the application of logical reasoning and common sense. We thus hold that the Board's decision that the employer violated the NLRA in discharging Gibson is not supported by substantial evidence. Rather, Gibson gave his employer cryptic and false answers in response to inquiries about the materials stolen from the manager's log./16 Whether Gibson actually stole the materials in question is irrelevant. What is relevant is that Tucci had a logical and legitimate reason to suspect that Gibson was involved in the removal of the documents. When Gibson was less than forthright with his answers, Tucci was justified in terminating his employment. Tucci would have terminated Gibson for giving misleading answers in the course of an investigation into stolen property regardless of Gibson's union involvement. Vulcan Basement Waterproofing of Ill., Inc. v. NLRB, 219 F.3d 677, 684 (7th Cir. 2000) ("[T]he employer can . . . avoid a finding of an unfair labor practice if it can show that it would have taken the action [Gibson's termination] regardless of the employee's union activities.")

C.  Tucci Hostility Toward the Union

It is well established that it is an unfair labor practice to grant or even to promise a benefit (wage increase or otherwise) in order to discourage an employee's support of a union. Van Vlerah, 130 F.3d at 1262. When determining if an employer's actions are forbidden by the NLRA, we must ask ourselves if the employer's action "'reasonably tended to interfere with or coerce employees in the exercise of their protected rights.'" Carry Cos., 30 F.3d at 934 (quoting Weather Shield Mfg., Inc., Millwork Div. v. NLRB, 890 F.2d 52, 56 (7th Cir. 1989)).

1.  Increased Security

The Board disagreed with the ALJ and determined that Tucci's increase in security from one security guard on Friday and Saturday nights to one security guard every day violated the NLRA because no business justification was ever

"communicated to [Tucci] employees." However, the Board failed to cite any authority, nor are we aware of any, stating that a business decision will be justified only if that decision is discussed with employees; presumably because there is no such legal authority. Rather, the record in this case establishes that Kozak was informed by a local restaurant that it had experienced two disturbances involving union agent Maloney and the Union's president. It was after Kozak was informed of these disturbances that Tucci decided to increase its security force.

Under the circumstances present in this case, we disagree with the NLRB's conclusion that Tucci violated the NLRA for the following reasons. First and foremost, Tucci management had a legitimate business reason to increase its security, namely that Tucci had reliable information that high-ranking union members had been involved in a disturbance which required police intervention at a nearby restaurant. Second, both the ALJ and the Board agreed that there was "no persuasive evidence that the [security personnel] engaged in actual surveillance of the employee's union activities." Third, the lone security officer was not in uniform and never attempted to intimidate or interfere with any union supporters or other employees. Finally, we are of the opinion that it makes more sense to encourage rather than discourage employers to take security concerns seriously; to condemn Tucci's actions in this case, at least with regard to the increase in security, would send the wrong message to employers. Once again, the Board's decision displays result-oriented decision-making rather than the even, well-reasoned application of the NLRA, precedent, and common sense.

2. Solicitation Discipline

"As a rule, . . . an employer cannot be compelled to allow distribution of union literature by nonemployee organizers on his property." Lechmere, Inc. v. NLRB, 502 U.S. 527, 533 (1992). However, there is an exception to this rule./17 An employer may not discriminate in violation of section 8(a)(1) by denying "union access to its premises while allowing similar distribution or solicitation by nonemployee entities other than the union." Lucile Salter Packard Children's Hosp. v. NLRB, 97 F.3d 583, 587 (D.C. Cir. 1996) (emphasis added); see also Lechmere, 502 U.S. at 534; Babcock, 351 U.S. at 112. Under the non-discrimination exception, "[a]n employer may not exercise its usual right to preclude union solicitation and distribution on its property if the employer permits similar

activity by other nonemployee entities in similar, relevant circumstances." Lucile Salter Packard, 97 F.3d at 587.

The ALJ, who was affirmed by a unanimous Board on this point, concluded that Tucci violated the NLRA when it disciplined three employees for soliciting union support at work. The ALJ, in reaching his conclusion, relied on the fact that Tucci management had allowed non-union solicitations in the past such as the employee selling of girl scout cookies, hand-made Christmas ornaments, hand-painted bottles, theater tickets, and raffle tickets.

As stated above, Tucci violated the NLRA if it discriminated by punishing the three employees for soliciting union support but allowing other, similar solicitations by other employees. We are of the opinion that solicitations for girl scout cookies, Christmas ornaments, hand-painted bottles, and the other examples listed by the ALJ certainly cannot, under any circumstances, be compared to union solicitation as support for the ALJ's determination that the restaurant engaged in a discriminatory application of its non-solicitation policy./18 We are at a loss to comprehend how a restaurant could maintain positive relations with its employees and customers if it failed to allow an activity as innocent as the sale of girl scout cookies or the sale of hand-blown Christmas ornaments during the yuletide season. In short, the examples listed by the ALJ can be seen as beneficial to all employees, whereas the union solicitation by the three disciplined employees obviously, according to the record, made some of the employees uncomfortable enough to complain to management./19 A restaurant in the United States of America should be free to prohibit solicitations on the premises that interfere with or bother employees or customers, and allow those solicitations which neither interfere with nor bother employees or customers. In this case, the record is barren of any evidence that Tucci management allowed other unwanted solicitation in its restaurant. We do not believe that the Board's decision is supported by substantial evidence and we are of the opinion that Tucci was not in violation of the NLRA when it issued written warnings to three employees for union solicitation on the company's premises.

3. The Bomb Threat

As described earlier in the opinion, Kozak informed Tucci employees that Ricci believed that the Union was responsible for the bomb threat that she and Gibson received, and that Ricci had

left town out of fear for her life despite the fact that Ricci had left town to visit her parents. According to the ALJ,

Kozak's statement that Ricci fled the city because she had been threatened by the Union was so completely unfounded that if it did not constitute an intentional lie, it was so reckless and irresponsible as to warrant the same sanction. I find that Kozak's remarks patently conveyed to the employees that they were in a real and immediate danger from union violence. I find that the objective tendency of such remarks was to cause fear, confusion and dissension in the ranks of possible prounion voters and solidify antiunion voters in the upcoming election.

However, "[i]n determining whether an employer's activities [or speech] are forbidden by the Act, the appropriate inquiry is whether those actions reasonably tended to interfere with or coerce employees in the exercise of their protected rights." Van Vlerah, 130 F.3d at 1262. Furthermore, we must look into the circumstances and context in which the statement was made. Id. at 1262-63.

In this case, Tucci management displayed a letter to its employees, written on union stationery, that was mailed to a number of Tucci's preferred customers informing the customers that they might be required to rate servers on their next visit to the restaurant and, furthermore, that they might even be called to testify in future court proceedings. When asked by Kozak what she thought of the letter, Ricci responded that if the letter had indeed come from the Union she would be very upset. She further informed Kozak that she was going to contact the Union before leaving town that night to visit her parents over the Christmas season. However, unbeknownst to Kozak, Ricci left the Chicago area that night without contacting the Union.

Kozak was also advised that Ricci received a bomb threat from an unidentified source on the very same night that he thought Ricci had gone to the union headquarters to express her disappointment if the Union was involved in the letter-writing campaign. Furthermore, rumors of the bomb threat had already circulated among Tucci employees and the mere fact that Kozak informed them of the threat Ricci received cannot be deemed as a violation of the NLRA because Kozak was not telling the employees anything they didn't already know.

The General Counsel for the NLRB argues that

Kozak violated the Act when he informed Tucci employees that Ricci believed that the bomb threat was from the Union and that Ricci had left town because of her fear of union violence. However, when the entire record is considered it is possible to understand what might have lead Kozak to attribute the bomb threat to the Union.

Initially, Ricci informed Kozak that she was going to contact the Union and inquire whether they had any involvement with the letters that were mailed to Tucci's preferred customers. It is reasonable for Kozak to have taken Ricci at her word and assume that she had actually contacted the Union as she stated she intended to do that very night. Next, because the letter was written on union stationery, it is a logical inference for Kozak to have believed that the Union was involved in the letter-writing campaign to Tucci's preferred customers. It is also reasonable to believe that the Union told Ricci that it was involved in the letter-writing campaign. It is also a logical step to assume that once the Union informed Ricci that it had participated in sending the letters to Tucci customers, Ricci would have decided that she no longer wanted to be associated with the Union.

Additionally, and although many people feel otherwise, there is still a perception amongst many of the public at large, going back to the days of Jimmy Hoffa, that unions, violence, and the mob are somehow interrelated. See generally, Julie Kosterlitz, Searching for New Labor, National Journal, Sept. 4, 1999; Jonathon Cohn, Hard Labor: John Sweeney, modern militant, Oct. 6, 1997. Added to that, Kozak had been advised by a manager from another local restaurant that high-ranking members of the same Union that was attempting to organize at Tucci Milan had been involved in two disturbances at the neighboring restaurant which necessitated police intervention. Apparently, Kozak assembled these bits of information and innuendos and constructed a scenario that had the Union threatening to bomb the residence of one of its supporters.

Finally, Gonzales immediately spoke up at the meeting and told Kozak that she did not believe that the Union had threatened Ricci because those employees in contact with the Union would have heard about it. Gonzales further made clear to the employees assembled that Ricci had not left town out of fear of union violence, but that she had gone to Rhode Island to visit her parents.

Therefore, the employees were faced with assessing the truthfulness of Kozak's version of events where the Union threatens to blow up one of its own supporters and Gonzales's version that

she doubted any Union involvement in the bomb threat. Furthermore, Gonzales informed the assembled employees that the real reason for Ricci's departure from town was to visit her parents during the holidays.

Our inquiry in this case is whether, when considering all the factors surrounding Kozak's statements, the employees were interfered with or coerced into voting against the Union. Based on this record, we are of the opinion that Kozak's comments cannot reasonably be read as influencing or coercing Tucci employees. Consequently, Kozak's attribution to the Union of the bomb threat received by Ricci does not violate the NLRA.

D.  Solicitation of Grievances

As stated earlier in the opinion, the ALJ concluded that although senior vice president, Charles Haskell, and the president and founder of LEYE, Richard Melman, solicited grievances from employees days before the union election, this conduct was lawful because it did not differ significantly from Tucci management's previous conduct. However, the two-member majority of the Board disagreed with the ALJ and concluded that Tucci management "was not engaged in following its preexisting grievance procedure or a comparable process and that its preelection promises to reopen previously resolved matters constituted the unlawful solicitation of grievances."

The Board, in disagreeing with the ALJ, relied on the fact that none of Tucci's grievance polices contemplated that high-ranking officials would "ferret out problems or resolve grievances." However, we are of the opinion that the Board took too narrow of an approach to the realities of the employer-employee relationship in the "nineties."

An employer violates the NLRA when the employer interferes with employees in the exercise of their rights by soliciting grievances when such solicitation is accompanied by express or implied promise of benefits specifically aimed at interfering with, restraining, or coercing employees in their organizational effort. NLRB v. Berger Transfer & Storage Co., 678 F.2d 679, 691 (7th Cir. 1982). However, it is undisputed that the mere presence of Haskell and Melman at Tucci Milan did not violate the Act.

In this case, Melman discussed a Christmas tip issue with an employee. This was an issue that Melman had personally been involved with in the past and we see no reason why Melman should be

precluded from revisiting the issue when an employee complains about it. In fact, just the opposite is true; the fact that Melman was involved with these types of disputes in the past supports the ALJ's finding that the solicitation of grievances was in conformity with the past business practices of the restaurant.

The situation would be different if Melman promised a different resolution of the matter. But, Melman merely stated that although he thought the issue had been resolved, he would look into the matter. Furthermore, we are of the opinion that while Melman was legitimately engaged in a discussion concerning the Christmas tip issue, it is natural that complaints over other issues might arise and we are unable to understand why such discussions would violate the NLRA./20

We are also of the opinion that Haskell's visit to the restaurant immediately before the union vote did not violate the Act. It is important to note that Haskell never promised to remedy situations that had previously been decided against employees. Rather, Haskell's discussion with Gonzales was a dialogue concerning the pros and cons of union organization. And, although Haskell did promise to reopen some matters, we agree with the ALJ that there is no evidence in the record that he made any specific promise as to any action that would be taken. Consequently, we are of the opinion that Haskell did not solicit grievances as an inducement for employees to abandon their support for the Union, and, thus, no violation of the Act occurred.

Given our conclusion that none of Tucci Milan's actions violated the NLRA, we GRANT Tucci's petition for review, DENY the General Counsel's cross-petition for enforcement, and VACATE the decision of the NLRB.

/1 Tucci Milan is an Italian restaurant in Chicago, Illinois, which is jointly owned by 6 West Limited Corp. and Lettuce Entertain You Enterprises, Inc. (LEYE). Throughout the opinion the petitioners/cross-respondents will be referred to as either Tucci or Tucci Milan.

/2 The labor organization in this case was the Hotel Employees and Restaurant Employees Union, AFL-CIO, Local 1.

/3 The relevant portions of the NLRA are codified at 29 U.S.C sec. 158(a) (Unfair labor practices), and state:

(a) Unfair labor practices by employer

        It shall be an unfair labor practice for an employer--

(1)  to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

* * *

(3)  by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . . .

/4 The manager's log is a three-ring-binder containing a one-page synopsis of business for every day that the restaurant is open, as well as managers' sometimes derogatory comments on employees' and customers' behavior and personalities. The log is kept in the manager's locked office and contains summaries dating back one or two years.

/5 Gibson testified at the hearing before the ALJ that he received copies of the log statements in the mail at an unspecified time in the summer of 1994 and decided they were important enough to warrant sharing with coworkers. Ricci, Greg Calvird, and Elaine Gonzales (both servers at Tucci Milan) also testified to receiving copies of the log in the mail.

/6 Gibson testified at the hearing before the ALJ and offered the rather ridiculous explanation that he told Schrader that the documents were not stolen because the photocopies of the manager's log that he had made were not, themselves, stolen. Gibson further testified to telling Schrader that "maybe someone threw it out in the garbage," such as a manager with office access.

/7 Katz stated that the person responsible for the theft of the documents would be arrested and made veiled threats that anyone with information about the theft should come forward or risk being considered an accomplice. Katz also made the threatening comment that the restaurant could be visited by the Immigration and Naturalization Service.

/8 It is a common practice for servers to "tip-out" other employees, such as bartenders, busboys, and hostesses, after their shift.

/9 At the meeting, Gibson was told that if he was "cleared" of the charges, he would be reinstated with full back pay. Despite management's suspension of Gibson, he continued to pass out

his "Constructive Criticism" document.

/10  Even though Gibson was advised that he was only being suspended pending the results of a police investigation, at the time Gibson was terminated no police investigation had been concluded. Furthermore, Gibson has not been charged with the theft of the manager's log.

/11 The record does not reveal whether the call was ever successfully traced.

/12 The late warning was, in fact, not removed from the employee's file.

/13 Only those charges relevant to this appeal will be discussed.

/14 The Regional Director consolidated all of these allegations into a consolidated complaint. The consolidated complaint further alleged that in early January 1995, Haskell and Richard Melman solicited employee grievances and that Haskell impliedly promised remedy thereof and granted benefits to employees, including the removal of disciplinary personnel file write-ups, to discourage union activities. Finally, the complaint further alleged that from October 1994 through January 1995, security personnel hired by the restaurant engaged in surveillance of its employees' union activities, and attempted to stifle union support.

/15 Neither the Board's majority decision nor the dissenting judge specifically commented on Kozak's attribution of the bomb threat to the Union. However, the NLRB order does prohibit Tucci from "falsely tell[ing its] employees that the Union is responsible for bomb threats to employees, or explicitly or implicitly warn[ing] that they are in imminent danger of union violence."

/16 The ALJ also questioned Gibson's credibility on several grounds.

/17 There are actually two exceptions to this general rule. An employer violates section 8(a)(1) if it prohibits union access to the employer's property if the employees are otherwise "inaccessible" because they are "'beyond the reach of reasonable union efforts to communicate with them.'" Lechmere, 502 U.S. at 534 (quoting NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 112 (1956)). However, this exception does not apply to this case.

/18 Of course, a restaurant would discriminate in the enforcement of its non-solicitation policy if it prohibited union solicitation but allowed

employees to solicit business, political, religious, or other association membership.

/19 We do not read the ALJ decision as discrediting Kozak's testimony that employees were "uncomfortable" with the union solicitation. Rather, the ALJ and the Board relied on the allegedly discriminatory application of Tucci's non-solicitation rule.

/20 We are aware of the fact that Melman informed Akmakjian that he would look into a late disciplinary warning that the employee believed was unfair. While Melman did not promise any particular result, Haskell informed Akmakjian that the warning had been removed from his file despite the fact that the warning was never removed. Although we certainly do not approve of management falsely informing its employees that grievances had been resolved in their favor, we are of the opinion that the fact that Akmakjian was falsely informed as to the outcome of a grievance does not constitute a violation of the NLRA because, as the ALJ concluded, Melman's and Haskell's "reception of employee complaints [did not] constitute . . . a significant departure from an ongoing past practice."